JEAN CHARPENTIER, Plaintiff-Appellant, v. THE CITY OF CHICAGO, Defendant-Appellee.—MICHAEL O'CONNOR, Plaintiff-Appellant, v. THE CITY OF CHICAGO, Defendant-Appellee.

First District (3rd Division)   Nos. 85—1984, 85—1985 cons.

Opinion filed December 17, 1986.

Anesi, Ozmon, Lewin & Associates, Ltd., of Chicago (Curt N. Rodin, Nat P. Ozmon, and Dario A. Garibaldi, of counsel), for appellants.

Judson H. Miner, Corporation Counsel, of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiffs, Jean Charpentier and Michael O'Connor, filed separate actions against defendant, the city of Chicago, alleging that defendant's negligent maintenance of a street resulted in an automobile accident in which plaintiffs were injured. Prior to trial, the trial court entered an order dismissing a count from each complaint alleging that defendant had a duty to install median barriers. The cases were tried together. A jury returned a verdict in favor of defendant, and the trial court entered judgment on the verdict. Plaintiffs appeal from that judgment, contending that the conduct of defense counsel at trial prevented them from receiving a fair trial. Plaintiffs also contend that the trial court erred in dismissing the median-barrier counts.

On December 5, 1976, while operating a Buick northbound on South Lake Shore Drive, Lemard Loyd crossed over the double line separating northbound and southbound traffic and crashed head-on into a southbound Opel driven by plaintiff O'Connor. Plaintiff Charpentier was a passenger in the O'Connor vehicle. The O'Connor vehicle in turn struck a southbound Camaro driven by Selma Mayo Powell. The theory of plaintiffs' case was that Loyd struck a pothole in the road, causing him to lose control of his car.

Evidence at trial established that potholes were present in some areas south of Shore Drive, which intersected with Lake Shore Drive just south of 5400. Potholes were not present, however, between 5300 and Shore Drive. The outcome of the trial, therefore, depended upon the credibility of witnesses who testified as to whether Loyd struck a

pothole, which in turn depended on whether Loyd lost control of the car south of Shore Drive or between 5300 and Shore Drive where no potholes were present. Part of the dispute as to location arises from the fact that there are no buildings on the Outer Drive and consequently no street numbers.

Prior to trial, the trial court held that as a matter of law defendant could not be held liable for failure to install median barriers on Lake Shore Drive. The court dismissed the counts related to that issue. Those counts had alleged that defendant created a road condition such that it was foreseeable that vehicles would cross a nonbarricaded median and enter the path of oncoming traffic, and that defendant knew or should have known of previous accidents due to crossovers of medians, and that defendant failed to erect barriers or remedy the dangerous situation.

Dr. Howard Matis testified for plaintiffs that he was a physicist at the University of Chicago at the time of the accident. Matis had obtained a certain level of security clearance from the United States government because of his access to hydrogen bomb and similar weapon-systems information. On the day of the accident, Dr. Matis was walking south along the lake with his fiancee, about half-way between 5400 and 5500 South Lake Shore Drive. He heard a "sound [which] seemed like a car, what would happen if a car struck a pothole." He had heard that sound many times before. The sound came from just south of a curve in the road, which would be just a few yards north of the Shoreland Hotel. As soon as Dr. Matis heard the sound, he turned to see if the car was damaged. He then "saw two cars about to collide head on." The vehicles were located just north of where Dr. Matis stood and were both in the southbound lane immediately west of the center dividing line. One car was a Buick, but Dr. Matis could not describe the make of the other car. A third car was then hit, and one of the three cars hit a lamppost. Dr. Matis stated that the accident could have been avoided if the road was in better condition. Dr. Matis testified that no one had mentioned anything to him about hearing a sound like a pothole before he so informed the police.

Out of curiosity two days later, Dr. Matis returned to the scene. He did not return at the request of any attorney or police officer. Driving northbound in the innermost lane and slower than the flow of traffic, Dr. Matis observed 3 to 10 potholes. The larger potholes were larger than 1 foot in width and were more than 3 inches deep. Dr. Matis also testified that he knew the potholes were in the same area where he had been standing at the time of the accident, and where he had heard the Loyd car strike a pothole, for several reasons. They were located

just past an underpass; he remembered standing at a certain location on the lakefront path; and the potholes were slightly north of that spot. Dr. Matis was familiar with the stretch of road because he lived a few blocks from there at that time and drove on it a few times a week. He remembered similar potholes being in that location in September, October, and November of 1976.

James Walker, an eyewitness, testified for plaintiffs that on December 5, 1976, he was driving southbound on South Lake Shore Drive when he saw a Buick in the northbound lane hit a bump. "When I saw it hit the bump it was coming into the southbound lane. *** When it hit the bump it went right in the southbound lane." The Buick then struck an Opel, which in turn struck a Camaro. Walker testified that the accident occurred "around 5400." He marked a point on a photograph showing that Loyd hit the bump at approximately the point where the Shoreland Hotel is located, which is at 5445 South Lake Shore Drive.

Walker testified further that he had been driving that stretch of road for about two or three years. The innermost northbound lane at the location where he saw the Buick hit the bump had "a lot of potholes." He described the potholes: "[O]ne was *** about the size of a manhole; and it had a cluster of smaller holes around it ***. The large one was about four to five inches deep, and the others were about two or three inches." Walker saw the potholes on the day of the accident when he was going to work, and the potholes had been present for some time. He associated the accident with the potholes "because I saw the car hit the bump."

Lemard Loyd, the driver of the northbound Buick, was deceased at the time of trial, and his evidentiary deposition was read to the jury. Loyd testified that he had not experienced any mechanical problems with his car prior to or on the day of the accident. On December 5, 1976, Loyd entered Lake Shore Drive at 6300 south and headed north, driving in the innermost northbound lane of the six-lane road. Loyd stated that he lost control of his car because he hit a hole in the street. When asked if this occurred at approximately 5300 south, Loyd replied, "Right, right." Just prior to hitting the hole, Loyd wondered why an automobile three car lengths in front of him weaved to the right. As his car hit the hole, Loyd's body was thrown to the side and he was unable to sit up straight in order to regain control of the car. When asked if his car crossed the center line into the southbound traffic, Loyd stated: " I couldn't tell that myself, because I was fighting, trying to get straightened up. I never got straightened up." Loyd could not remember anything after the collision until he woke up in the

hospital. After the accident, someone told Loyd that he had hit a hole. He did not know the size of the hole. Loyd knew what it felt like to drive over the hole in the street. "I felt the bump. I felt it. That's what knocked me out of control of the car. *** I heard a noise, and in a split second I didn't know what was going on."

Plaintiff Charpentier testified that on December 5, 1976, she was a passenger in a car driven by plaintiff O'Connor. After attending a brunch, they were on their way to the Museum of Science and Industry, traveling southbound on Lake Shore Drive. She had no memory of the accident.

Plaintiff O'Connor testified that he had no recollection of the accident or of being in the hospital. He could remember almost nothing for the period of one to two years prior to the accident. The knowledge he had of the accident, which he had testified to at trial and at an earlier deposition, was derived from what other people had told him in an attempt to help him regain his memory.

Joseph Kostur, district safety and claims manager and keeper of the records for District One of the Illinois State Department of Transportation, Division of Highways, testified for plaintiff that pursuant to a 1976 maintenance contract between the city of Chicago and the State of Illinois, the city was required to perform routine surface and pothole repairs and other routine operational services on Lake Shore Drive where the accident occurred.

William Moorman, a Chicago police officer, was called to testify by both plaintiffs and defendant in regard to his investigation on the day of the accident. The accident occurred at 3:55 p.m., and he arrived at 4:05 p.m. He spoke with Walker and Dr. Matis at 4:25 p.m. On the accident report Moorman noted 5338 South Lake Shore Drive as the location of the accident. Moorman first testified that he thought 54th Street, which did not go through to Lake Shore Drive, was the nearest cross street to the impact, but later testified that he thought 53rd Street was the nearest cross street. He did not know how far the three cars traveled after the impact and was never able to determine where Loyd had actually crossed the center line.

In regard to the condition of the street, Moorman walked south from the point of impact for one-half to three-quarters of a block, stopping at approximately the point where Shore Drive intersects with Lake Shore Drive. He did not see anything which might have caused Loyd to cross the center line. He did not walk further south because he believed that if something in the roadway caused Loyd to cross the center line, the Buick would have had time to return to the proper side of the roadway before the collision. Moorman inspected

the roadway at about 4:35 to 4:45 p.m. and recalled that it was not dark. A professional meteorologist testified, however, that on December 5, 1976, in Chicago the sun set at 4:20 p.m. and it was completely dark at 4:30 p.m.

John Manganese, a photographer who had been employed by O'Connor's counsel, testified for defendant that on December 16, 1976, he went to 5338 South Lake Shore Drive to check for pavement depressions large enough to cause loss of control. Manganese took five photographs of the area between 53rd Street and the next intersection, which was Shore Drive, and found no potholes. He did not walk as far as the Shoreland Hotel, which is located just south of the Shore Drive intersection at 5445 South Lake Shore Drive.

Lester Dickinson, the commissioner of streets and sanitation for Chicago, testified for defendant. He did not know who had jurisdiction of the streets in 1976 and did not know if the city maintained South Lake Shore Drive in 1976. Dickinson stated that a pothole wide enough for a tire to fit in would constitute a hazard to the traveling public. If potholes were on South Lake Shore Drive, he would be concerned and give priority to having them fixed because of the speed limit and because cars traveling northbound are very close to southbound traffic. If 3 to 10 potholes remained in one lane for four months, it would be too long, and they should have been repaired.

Charles McClean, traffic and maintenance manager with the Department of Transportation, District One, testified for defendant that Lake Shore Drive is under a city maintenance agreement. Defendant had the "maintenance responsibility" to fix potholes on South Lake Shore Drive in December 1976. At that point, defense counsel stated that he would stipulate to that fact.

Selma Mayo Powell, the driver of the Camaro which was the third car hit, testified for defendant that the collision occurred "about just south of 53rd Street." Powell first saw the northbound Buick when she was "just north of 53rd Street" and the Buick was "about a block or so south" of her. Powell testified that she was in the far right lane just north of 53rd Street. However, on cross-examination she was reminded that the far right lane is an exit-only lane north of 53rd Street. Powell did not remember if she had been changing lanes after passing the 53rd Street exit when she first saw the Buick. Powell later specified that when she first saw the Buick, it was "somewhere near the intersection [of Shore Drive and Lake Shore Drive]. Maybe a little bit south of it, but near the intersection." The Buick was heading north but was in a southbound lane. Powell never saw the Buick while it was in the northbound lane. In

regard to potholes, Powell testified that she did not see the Buick strike a pothole, she was not familiar with where potholes were located on that street, and she "wouldn't even attempt to" say whether there were any potholes in the northbound lanes.

Dr. James Stankiewicz, an ear, nose, and throat specialist, testified for defendant that he saw Loyd in the hospital emergency room on December 5, 1976. Loyd had a wound on his face which was open down to the bone and his lip was partially torn off. If they had not been faced with plaintiffs' injuries, Loyd's serious wound would have demanded immediate surgery, but Dr. Stankiewicz did not have the chance to talk to Loyd. Loyd arrived at the hospital shortly at 4 p.m., was admitted at 8:30 p.m., and had surgery around 10 or 11 p.m., when his face wound was cleaned and closed. Just prior to surgery, Dr. Stankiewicz took Loyd's history. When Loyd arrived at the emergency room, Dr. Stankiewicz believed Loyd was intoxicated. Loyd smelled of alcohol. He did not observe Loyd walking or note slurred speech, but Lloyd "was yelling out at the nurses to have somebody see him and get him treated and was generally being pretty boisterous."

■ We initially address plaintiffs' contention that the trial court erred in dismissing certain counts related to defendant's duty to erect median barriers on Lake Shore Drive and to warn of hazards caused by the absence of those barriers. Plaintiffs characterize defendant's obligation as a duty to design the street with reasonable care; a duty to maintain the street, which included erecting median barriers; and a duty to use signs on the street warning motorists of the hazard created by the absence of barriers. The dismissal of a count may be upheld where it clearly appears that plaintiff cannot recover under any set of facts which can be proved under the pleadings. *Cirafici v. Goffen* (1980), 85 Ill. App. 3d 1102, 407 N.E.2d 633.

■ Under common law, local governments have a duty to maintain public property in a reasonably safe condition. (*Curtis v. County of Cook* (1983), 98 Ill. 2d 158, 456 N.E.2d 116.) Municipalities are not liable for failing to undertake public improvements on the roadways. (*American State Bank v. Cude* (1975), 30 Ill. App. 3d 206, 331 N.E.2d 825.) The responsibility of public entities has only been extended to undertakings which they choose to carry out. (*Horrell v. City of Chicago* (1986), 145 Ill. App. 3d 428, 495 N.E.2d 1259.) Thus, defendant had no common law duty to install median barriers on Lake Shore Drive.

■ Plaintiffs rely on defendant's statutory duty to maintain the roadway in a reasonably safe condition to prove that defendant has the duty to erect median barriers. (See Ill. Rev. Stat. 1975, ch. 85, par. 3—

102, 3—103(a).) The Act creates no new duties but merely sets forth the common law duty, and as we have stated, the duty to maintain roadways in a reasonably safe condition does not extend to the creation of public improvements. (*Horrell v. City of Chicago* (1986), 145 Ill. App. 3d 428, 495 N.E.2d 1259.) Additionally, the allegations contained in the complaints do not show any contractual obligation to erect median barriers. Any testimony offered at trial regarding contractual obligations would not be relevant to the counts, which were dismissed prior to trial.

■ Plaintiffs' contention that defendant has a duty to warn motorists of the absence of median barriers is unsupported by any allegations in the complaints. In addition, since we have found no duty to provide the barriers, we cannot see how there would be a duty to warn of the failure to provide barriers. Plaintiffs' contention that defendant negligently designed Lake Shore Drive without barriers is also unsupported by any factual allegation in the complaint. Any possible references are vague and conclusory and thus insufficient under Illinois pleading requirements. (See *Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 430 N.E.2d 976.) For these reasons, we find that the trial court properly dismissed the median-barrier counts of plaintiffs' complaints.

■ Plaintiffs also contend that the prejudicial conduct and comments of defense counsel deprived them of a fair trial. In our view, the actions of defense counsel here were prejudicial and resulted in an unfair trial.

Initially we note that it is especially important to have a trial free of errors which might influence the verdict when the evidence on the issue of liability is so close that the jury might reasonably have returned a different verdict. (*Gabosch v. Tullman* (1974), 21 Ill. App. 3d 908, 316 N.E.2d 226; *Bulleri v. Chicago Transit Authority* (1963), 41 Ill. App. 3d 95, 190 N.E.2d 476.) In the present case, the issue of liability depended upon proof of the existence of any potholes and upon proof of Loyd's losing control at the point where those potholes were present. Because the evidence on the issue of liability was in sharp conflict and consequently the jury reasonably might have returned a verdict for plaintiffs, any errors which might have influenced the verdict, especially errors harming a witness's credibility, were prejudicial here.

Plaintiffs have cited many instances of alleged improprieties by defense counsel. We deem it necessary to comment only on several such instances to demonstrate the unfairness of the trial.

Prior to trial, plaintiffs had presented a motion *in limine* regard-

ing the alleged intoxication of Loyd. The trial court denied the motion on the basis of defense counsel's assurance to the court that he would present testimony of Ms. Middleton, Ms. Powell, paramedics, and other witnesses who would testify as to Loyd's "drinking spree." In his opening statement, defense counsel stated that Loyd "met a friend of his and they split a fifth of whiskey *** and they were really high." Defense counsel also stated that "Mr. Turner or Mr. Loyd or Mr. Lord or whatever he's called was so intoxicated he couldn't tell anybody what happened." During trial, defense counsel referred to Loyd as an alcoholic. Middleton and the paramedics were not called as witnesses by defendant. Powell testified, but was not asked about Loyd's intoxication. Loyd testified at an evidentiary deposition but was not examined about his consumption of alcohol. Only Dr. Stackiewicz offered an opinion that Loyd was intoxicated.

There was absolutely no evidence to support the comments made in defense counsel's opening statement, *e.g.*, that Loyd had "split a fifth of whiskey," had gone "to another tavern," was "really high," or was "so intoxicated he couldn't tell anybody what happened." Absent good faith, it is reversible error to comment in opening statement about evidence which counsel does not intend to prove. (*Schwedler v. Galvan* (1977), 46 Ill. App. 3d 630, 360 N.E.2d 1324.) The only explanation offered by defense counsel for his failure to present evidence in support of his comments was made at the hearing on plaintiffs' motion for a new trial. Counsel stated that he had decided, as a trial tactic, not to produce those witnesses. Such an explanation does not even suggest good faith. Even more egregious was defense counsel's reference to Loyd's alcoholism. Such a remark was improper and extremely prejudicial.

We also note that counsel's repeated references to bars and taverns during cross-examination of plaintiffs improperly created prejudicial inferences which tended to place plaintiffs in a bad light. Plaintiffs' negligence was not at issue in this case. The fact that certain taverns sponsored athletic teams of which plaintiffs were members had no relevancy to the accident or to plaintiffs' injuries. The innuendos regarding drinking by plaintiffs were improper, and we direct that they not be repeated during the retrial.

During cross-examination, Dr. Matis was asked whether he remembered that defense counsel had "asked to talk to you about this accident, and you told me you wouldn't talk to me because you were committed to the other side." Dr. Matis replied, "No, I did not." Plaintiffs' counsel objected on the basis that defense counsel would have to disqualify himself if he planned to impeach the witness with counsel's

own testimony. Defense counsel responded, "I will take the witness stand any time." The court sustained the objection. Dr. Matis was also asked whether he "talked to" plaintiffs' counsel prior to the deposition, and Dr. Matis replied, "On that day I talked to him. I also talked to you." Defense counsel stated, "I don't remember ***, sir, talking to you at all." The court sustained an objection, but denied plaintiffs' motion for a mistrial.

Defense counsel acted improperly by offering his own testimony before the jury while questioning Dr. Matis in regard to whether the witness had spoken to counsel prior to his deposition and whether the witness had refused to speak with defense counsel prior to trial because he had "committed" himself to the other side. Plaintiff is entitled to a fair trial, free from prejudicial conduct of counsel, who undertakes to supply facts or makes inferences not based upon evidence in the record. (See *Manninger v. Chicago & Northwestern Transportation Co.* (1978), 64 Ill. App. 3d 719, 381 N.E.2d 383; *Gordon v. Checker Taxi Co.* (1948), 334 Ill. App. 313, 79 N.E.2d 632.) Nor do we believe that the prejudice was cured by the trial court's sustaining of objections to defense counsel's testimonial interrogation.

Defense counsel also attacked Dr. Matis' credibility during trial by referring to him as a "hydrogen bombist." Defense counsel continued his attack on Dr. Matis' character during closing argument by repeatedly referring to him as "Dr. Strangelove, the atomic bomb maker." Such personal abuse of a witness diverts the jurors from judicious consideration of facts and law and is impermissible. (See *Allison v. Howell* (1974), 22 Ill. App. 3d 287, 317 N.E.2d 379; *Bulleri v. Chicago Transit Authority* (1963), 41 Ill. App. 2d 95, 190 N.E.2d 476.) Counsel does not have a license to indulge in abusive and prejudicial conduct or embarrass and belittle an adversary or his witnesses before the jury to such an extent that the hope of the adversary to gain respectful consideration of his case by the jury is seriously jeopardized. (See *Manninger v. Chicago Northwestern Transportation Co.* (1978), 64 Ill. App. 3d 719, 381 N.E. 2d 383.) Without minimizing the prejudicial effect of any single error, the cumulative effect of defense counsel's conduct was grossly prejudicial and demands a new trial. See *Bulleri v. Chicago Transit Authority* (1963), 41 Ill. App. 2d 95, 190 N.E.2d 476.

We also wish to comment briefly on another matter about which plaintiffs complain. Several witnesses, including one offered by defendant, testified that defendant had the duty to repair potholes on Lake Shore Drive. Indeed during trial, defendant stipulated to that fact. Yet in his opening statement, defense counsel stated that the State of Illi-

nois had maintenance jurisdiction of the street and during trial, examined a witness about the effect of a 1979 agreement with the Federal government on defendant's responsibility for the street. The constant reference to this nonissue may have confused the jury and should be avoided during retrial.

In regard to plaintiffs' argument that the trial court erred in denying their motions for a directed verdict and judgment notwithstanding the verdict, we find that the evidence was evenly balanced. It was not so overwhelmingly in favor of plaintiffs, when viewed in a light most favorable to defendant, to justify the entry of a judgment notwithstanding the verdict. See *Mackey v. Daddio* (1985), 139 Ill. App. 3d 604, 387 N.E.2d 1167.

For the foregoing reasons, the judgment of the circuit court of Cook County dismissing certain counts of plaintiffs' complaints is affirmed. The judgment upholding the jury verdict for defendant is reversed, and the cause is remanded for a new trial consistent with the holdings of this opinion.

Affirmed in part; reversed in part and remanded.

RIZZI, P.J., and WHITE, J., concur.