EDWARD A. KARSTEN, Guardian of the Person and Estate of Joan E. Karsten, a Disabled Person, *et al.*, Plaintiffs-Appellants, v. ROBERT McCRAY *et al.*, Defendants-Appellees.

Second District   No. 2—86—0279

Opinion filed June 26, 1987.—Rehearing denied July 29, 1987.

4

Philip H. Corboy and Susan J. Schwartz, both of Corboy & Demetrio, and David A. Novoselsky, both of Chicago, for appellants.

Roger K. O'Reilly and James L. DeAno, both of O'Reilly, Cunningham, Duncan & Norton, of Wheaton, for appellees Robert McCray and Glen Ellyn Clinic, S.C.

William V. Johnson, Donald N. Hoppe, Nancy Tordai O'Shaughnessy, and Thomas H. Fegan, all of Johnson, Cusack & Bell, of Chicago, for appellee Glen H. Asselmeier.

JUSTICE INGLIS delivered the opinion of the court:

In this medical malpractice action, plaintiffs appeal from orders entering judgment on a jury verdict in favor of defendants and denying plaintiffs' motion for a new trial. Plaintiffs challenge the propriety of certain defense counsel conduct and trial court rulings which plaintiffs contend denied them a fair trial. We reverse and remand this cause for a new trial consistent with the views expressed below.

In April 1979, Joan E. Karsten (Joan) was vacationing in Florida, at which time she experienced cramping in her stomach. Joan returned home from vacation on April 24, 1979. On April 28, 1979, Joan complained to her husband, plaintiff, Edward A. Karsten (Edward), of stomach pain. On April 29, 1979, at approximately 5:30 a.m., Edward took Joan to Central Du Page Hospital for treatment of a sharp pain in the lower right side of her stomach.

Joan was initially seen by Dr. Valentino Menis and was admitted to the hospital. Joan was seen again at approximately 10:30 a.m. by defendant, Dr. Robert McCray. Dr. McCray was unable to make a conclusive diagnosis; however, his initial impression was that Joan had early acute appendicitis. Dr. McCray ordered a series of tests. Joan's

pain continued through the evening of April 29, 1979. Dr. McCray next saw Joan at approximately 1:30 p.m. on April 30, 1979. At that time, Dr. McCray's impression was that Joan had a ruptured appendix. Approximately five hours later, Dr. McCray performed surgery. During surgery, Dr. McCray encountered an abscess which he felt was one to two weeks old. Dr. McCray drained the abscess and left the wound open for further draining. Joan was allowed to recover at the hospital until May 8, 1979, when Dr. McCray ordered that she be discharged. Joan was discharged by defendant, Dr. Glen H. Asselmeier. Upon discharge, Joan's wound was still open and draining. She was released without an antibiotic.

On May 11, 1979, Joan went to the outpatient department of the hospital where she was examined by Dr. Asselmeier. Dr. Asselmeier performed an incision and drained a developing abscess. Following this procedure, Dr. Asselmeier prescribed an antibiotic and pain-killer and released Joan.

On May 13, 1979, Joan experienced jerking, twitching, and slurred speech. On May 14, 1979, Joan went to the emergency room of the hospital where she was again seen by Dr. Asselmeier. Dr. Asselmeier took Joan's history and performed a physical examination. Dr. Asselmeier advised Joan that she did not require hospitalization, but admitted her to the hospital for observation on Edward's insistence. Dr. Asselmeier ordered a series of tests and arranged for a consultation with Dr. Paul Menet. Dr. Menet also ordered a series of tests. Dr. Menet's impression was that Joan had sepsis, an infection in the bloodstream. That same day, Joan was examined by Dr. McCray, who similarly concluded that Joan had sepsis.

On May 15, 1979, Dr. McCray examined Joan and found an abscess about the size of a hen's egg by probing her surgical wound with his fingers. No other abscess was found. On May 17, 1979, Joan complained of right flank pain consistent with an abscess in that area. That same day, Joan had a grand mal seizure. She registered a rectal temperature of 105 degrees and subsequently lapsed into a coma. Although tests taken at that time did not reveal any further abscess, additional consultations and examinations produced impressions that Joan was suffering from sepsis, which was creating a neurological disorder.

On May 20, 1979, Joan was being treated for septic shock and disseminated intravascular coagulation. Although Joan was being treated for possible infection, bacteria were not found in the blood or urine cultures taken during her hospitalization. Furthermore, the cause of Joan's coma was not conclusively explained.

For the duration of her hospital stay, Joan experienced kidney and renal failure, respiratory failure, and a central nervous system disorder. Joan's coma lasted until the first week in July. On July 9, 1979, Joan was transferred to Marianjoy Rehabilitation Hospital. Currently, Joan suffers from impaired coordination and balance; impaired speech, attention, and memory; and generalized weakness of her four extremities.

On August 15, 1980, Joan and Edward A. Karsten filed suit against Valentino Menis, M.D., Robert McCray, M.D., Glen H. Asselmeier, M.D., and Central Du Page Hospital. Valentino Menis was subsequently dismissed, and Glen Ellyn Clinical Facilities, Inc., was added as a defendant. On April 28, 1983, Glen Ellyn Clinic, S.C., was added as a defendant. Drs. McCray and Asselmeier were agents and employees of both Glen Ellyn Clinical Facilities, Inc., and Glen Ellyn Clinic, S.C. On September 20, 1984, the trial court entered an order substituting Glen Ellyn Clinic, S.C., for Glen Ellyn Clinical Facilities, Inc. On February 15, 1985, the court allowed plaintiffs to substitute Edward A. Karsten, guardian of the estate and person of Joan E. Karsten, a disabled person, as a proper party plaintiff in place of Joan E. Karsten.

The trial commenced on March 4, 1985. Plaintiffs presented two motions *in limine*. The first motion requested that defendants be prohibited from introducing testimony that Joan suffered from a condition of abdominal pain in Florida prior to April 29, 1979. This motion was denied. Plaintiffs' second motion requested that defendants be prohibited from introducing any evidence or making any reference suggesting that Joan suffered from a condition of weakness, central nervous system disorder, or multiple sclerosis at any time prior to her hospitalization on April 29, 1979. Defendants promised to call an expert, Dr. John Shaw, to provide evidence of a connection between a previous condition of weakness and Joan's current condition. Based on defendants' promise, this motion was also denied. Dr. Asselmeier also presented a motion *in limine* to bar plaintiffs from introducing testimony relating to the May 14, 1979, discussion between Edward and Dr. Asselmeier during which Edward insisted that Dr. Asselmeier admit Joan despite Dr. Asselmeier's opinion that she did not require hospitalization. This motion was allowed.

Numerous references were made at trial, including during opening statements, presentation of evidence, examination of witnesses, and closing arguments, regarding treatment Joan received in 1972 for weakness. Despite defendants' promise to the judge and jury that an expert witness would be presented to connect Joan's current injuries

to her condition in 1972, that witness was never called.

Defendants did call Dr. Menet and Dr. Richard H. Dominguez, as witnesses. Both Drs. Menet and Dominguez had previously been Joan's treating physicians. Before these physicians took the stand, counsel for Dr. McCray and Glen Ellyn Clinic, S.C., informed counsel for plaintiffs that he, or a representative of his office, had spoken with or would talk to both witnesses. Plaintiffs' counsel informed the trial court that neither Joan nor Edward had authorized or condoned such a meeting. Plaintiffs moved the trial court to bar the testimony of these physicians based on physician-patient privilege. This motion was denied.

At the conclusion of the trial, plaintiffs moved for mistrial on the basis that defendants had not established the promised nexus between Joan's condition in 1972 and her current condition. This motion was denied. Plaintiffs' counsel then asked that the references to any pre-existing condition be stricken and the jury be ordered to disregard them. This request was also denied.

Subsequently, the jury received its instructions. Over plaintiffs' objection, defendants were allowed to tender an instruction which provided that the proper standard of care for the defendants in this case was that standard which is practiced by well-qualified specialists in the same field practicing in the same or similar localities. On April 12, 1985, the jury returned a verdict in favor of defendants, Dr. Mc-Cray, Dr. Asselmeier, and Glen Ellyn Clinic, S.C. The trial court entered judgment on the verdicts of the jury in favor of defendants and against plaintiffs. Defendant Central Du Page Hospital had previously received a directed verdict in its favor following plaintiffs' case in chief.

On March 25, 1986, plaintiffs' post-trial motion for a new trial was denied. On April 1, 1986, plaintiffs filed a notice of appeal, appealing from the orders of the trial court entering judgment on the jury's verdict and denying plaintiffs' post-trial motion. Plaintiffs do not contest the dismissal of Central Du Page Hospital.

Plaintiffs raise the following issues on appeal: (1) whether defendants' references to a preexisting condition were proper absent their failure to introduce expert testimony establishing a nexus between that condition and Joan's current condition; (2) whether the trial court properly barred testimony regarding the circumstances of Joan's May 14, 1979, admission; (3) whether the trial court's instruction to the jury to apply the local standard of care was proper; and (4) whether testimony of Joan's treating physicians should have been barred by the court on the basis of physician-patient privilege.

8

■ In reviewing a jury verdict, an appellate court need not determine that the record is free of error, but rather, need only conclude that the error claimed did not preclude the losing party from receiving a fair trial. (*Buczyna v. Cuomo & Son Cartage Co.* (1986), 146 Ill. App. 3d 404, 420; *Barreto v. City of Waukegan* (1985), 133 Ill. App. 3d 119, 136.) It is especially important to have a trial free of those errors which might influence a verdict when the evidence on the issue of liability is so close that the jury might reasonably have returned a different verdict. (*Charpentier v. City of Chicago* (1986), 150 Ill. App. 3d 988, 996.) We believe that plaintiffs in the instant action have adequately shown prejudicial error such that they were denied a fair trial.

■ ■ Plaintiffs first contend that introduction of comments and testimony regarding the possibility that Joan had a preexisting neurological disease was prejudicial since no competent medical testimony was introduced to connect the two conditions. In response, defendants argue that the necessary evidentiary link was provided through the testimony of Drs. McCray, Dominguez, and Menet, who acknowledged that although they did not know what caused Joan's neurological problem, they considered the possibility that a preexisting neurological disease such as multiple sclerosis was aggravated by the stress of her surgery. We do not believe this provided a sufficient nexus.

Evidence regarding a plaintiff's preexisting physical condition may be relevant to the issue of damages in a case for personal injury. (*Intrater v. Thomas* (1977), 54 Ill. App. 3d 709, 714-15.) However, before evidence of a collateral incident can become relevant there must be both evidence of the preexisting physical condition as well as medical proof of a connection between that preexisting condition and the injury complained of. (*Tate v. Coonce* (1981), 97 Ill. App. 3d 145, 151-52.) In order to establish the necessary evidentiary link, the party arguing the relevancy of a preexisting condition must show more than a mere possibility that the preexisting condition is the cause of the injury. (*Rehak v. City of Joliet* (1977), 52 Ill. App. 3d 724, 727.) In *Rehak*, the plaintiff's personal physician testified that arthritis and diabetes "could or might" have caused the plaintiff to fall and injure herself. (52 Ill. App. 3d 724, 727.) The court excluded this testimony noting that the doctor only testified in terms of possibilities and that evidence of a preexisting condition was not, in and of itself, a sufficient causal connection between that condition and a later incident. 52 Ill. App. 3d 724, 727; see also *Khatib v. McDonald* (1980), 87 Ill. App. 3d 1087, 1096 (wherein the court held that defense counsel should have been precluded from inquiring about a prior back injury where a

connection could not be shown between that injury and the plaintiff's current condition); *Caley v. Manicke* (1961), 29 Ill. App. 2d 323, 331-32, *rev'd on other grounds* (1962), 24 Ill. 2d 390 (wherein the court affirmed a decision striking testimony elicited by defense counsel that plaintiff was in a previous accident, when defense counsel, contrary to his promise, failed to link the previous accident to plaintiff's injury).

In the instant action, as in *Caley*, defendants promised to produce an expert, Dr. Shaw, who would provide the evidentiary link. The trial court allowed defendants to repeatedly infer that a 1972 complaint for weakness was related to Joan's current injury. Joan's 1972 complaint was never diagnosed, Dr. Shaw was not called, and none of the doctors who did testify were able to state that, *based on a reasonable degree of medical certainty*, Joan's condition in 1972 was related to or responsible for her current condition. No nexus was established to support the inferences made by defendants.

Defendants correctly state that medical testimony is not always necessary to provide the evidentiary nexus. (See *Vandermyde v. Chicago Transit Authority* (1979), 73 Ill. App. 3d 984, 992.) In *Vandermyde*, the court distinguished cases disallowing inquiries into a preexisting condition, stating "[n]o case has held that the competent testimony may only be medical testimony, and the instances requiring additional evidence have involved an injury to another part of the body [citation], or plaintiff's denials of questions which implied the existence of another accident or related injury." 73 Ill. App. 3d 984, 992.

However, the alleged preexisting injury in the instant case is neither to the same part of the body nor similar to the injury complained of. In addition, there was never a diagnosis regarding Joan's preexisting condition. In 1972, Joan was examined for weakness of her left side, specifically in her left arm. Currently Joan is suffering from a generalized weakness of her extremities, slurred speech, and other cognitive defects. No conclusive diagnosis has been made regarding the reason for Joan's current neurological problems.

Regardless of defendants' failure to provide medical testimony to connect the two conditions, defendants' breach of a promise to call a witness to support statements made throughout the trial was itself prejudicial error. (*Charpentier v. City of Chicago* (1986), 150 Ill. App. 3d 988, 997.) In *Charpentier*, the court denied the plaintiff's motion *in limine* to exclude statements that a witness to a personal injury accident was intoxicated since defendant promised to produce a witness who would substantiate those statements. (150 Ill. App. 3d 988, 996-97.) Defendant subsequently failed to call the promised witness, and a jury returned a verdict in defendant's favor. (150 Ill. App. 3d

988, 990.) The appellate court remanded the case for a new trial finding that the defendant's failure to call the witness as "trial strategy" was in bad faith. 150 Ill. App. 3d 988, 997.

■ Similarly, in the instant case, defendants' intention to rest without calling Dr. Shaw, the promised witness, was not evidenced until the conclusion of their case in chief. The record merely indicates that defendants believed that it was not necessary to call him. In this context, good faith is questionable at best. In addition, the *Charpentier* court stated that defense counsel's remarks that a witness was an "alcoholic" were "egregious *** improper and extremely prejudicial." (150 Ill. App. 3d 988, 997.) Similarly, in the instant action, defendants' inquiry of Dr. Dominguez as to whether "Joan Karsten *** look[ed] like a person who might have M.S." is equally improper and highly prejudicial. Although the jury was admonished to disregard this question and its *affirmative* response, we believe that the mere utterance of these remarks strongly supports reversal.

In light of the dissimilarities between Joan's alleged preexisting condition and the injuries complained of in this case, a medical opinion should have been offered providing the necessary evidentiary link between the two conditions. In the absence of such testimony or evidence, defendants' repeated references to a preexisting neurological condition were prejudicial. Plaintiffs were entitled to have all testimony regarding Joan's preexisting condition stricken from the record. (See *Caley v. Manicke* (1961), 29 Ill. App. 2d 323, 331, *rev'd on other grounds* (1962), 24 Ill. 2d 390.) Despite plaintiffs' motion in this regard, the court refused to perform that function. As a result, the jury was allowed to consider numerous references regarding an alleged preexisting condition without any evidentiary basis. For these reasons, we therefore reverse the decision of the lower court and remand this cause with instructions that the trial court grant a new trial.

In view of the fact that there will be a new trial on remand, we take this opportunity to comment on a few other issues that might arise during that trial.

■ Plaintiffs next contend that defendants have abused the motion *in limine* process by inducing the trial court to bar the conversation between Edward and Dr. Asselmeier regarding the circumstances of Joan's admission to the hospital on May 14, 1979. Specifically, plaintiffs argue that Dr. Asselmeier's initial refusal to admit Joan is relevant to their claim against him for malpractice. In response, defendants argue that the May 14, 1979, conversation between Edward and Dr. Asselmeier is irrelevant since Joan was admitted and treated on that date. We disagree.

Plaintiffs cite *Magana v. Elie* (1982), 108 Ill. App. 3d 1028, and *Longman v. Jasiek* (1980), 91 Ill. App. 3d 83, in support of their argument. In both *Longman* and *Magana*, verdicts were upheld against physicians who abandoned or refused to treat patients after initially rendering care. (*Magana v. Elie* (1982), 108 Ill. App. 3d 1028, 1034-35; *Longman v. Jasiek* (1980), 91 Ill. App. 3d 83, 88.) Defendants correctly point out that neither of these cases supports plaintiffs' argument since Dr. Asselmeier did not abandon or refuse Joan treatment. Although initially stating that Joan did not require treatment on May 14, 1979, Dr. Asselmeier did in fact admit Joan, perform a physical examination, and arrange for a consultation with another doctor.

Nonetheless, we believe that the conversation regarding Joan's condition on May 14, 1979, is relevant to the plaintiffs' action against Dr. Asselmeier. In *Casey v. Penn* (1977), 45 Ill. App. 3d 573, 580-81, the court held that a doctor's conduct in delaying the plaintiff's post-operative care and delegating her treatment to other doctors significantly contributed to the growth of infection and the subsequent amputation of the plaintiff's arm.

Similarly, in the instant case, Dr. Asselmeier's conduct toward Joan indicates a disregard for her post-operative recovery which is relevant to the issue of his negligence. The May 14, 1979, conversation goes directly to Dr. Asselmeier's failure to recognize the seriousness of Joan's condition and is supported by other instances of his treatment. For example, on May 8, 1979, Dr. Asselmeier discharged Joan from the hospital without an antibiotic. On May 11, 1979, Dr. Asselmeier treated Joan for post-operative complications as an outpatient and prescribed an oral antibiotic despite the fact that she was complaining of persistent vomiting. These events, when coupled together, reflect on Dr. Asselmeier's view of Joan's general condition and are all relevant to the issue of his negligence.

Therefore, on remand, the trial court is instructed to allow plaintiffs to introduce evidence and testimony regarding the May 14, 1979, conversation between Edward and Dr. Asselmeier preceding Joan's admission on that date.

■ Plaintiffs next contend that the trial court's instruction that a local standard of care apply was improper since there was no evidence or testimony given at trial regarding a local standard. Plaintiffs also argue that defendants' use of the local standard instruction, in light of the testimony that national standards were applicable, was prejudicial since defendants' witnesses were local, as opposed to plaintiffs' experts, who were not from the community. Defendants respond that the local standard of care is the law in Illinois and may be given re-

gardless of the evidence and testimony presented at trial. While we agree that the local standard instruction is still valid in Illinois, we believe that it was improperly given in this case.

In *Hunter v. Sukkar* (1982), 111 Ill. App. 3d 169, 176, cited by defendants, the court held that a "community standard" or "locality" instruction was proper to describe the standard of care in medical malpractice cases even where experts at the trial testified that their opinions were predicated upon "national" standards. In *Hunter*, the plaintiff filed a complaint against the defendant doctor alleging negligence in post-operative care following surgery to repair a fractured forearm. (111 Ill. App. 3d 169, 170-71.) At trial, plaintiff's expert testified that based on national standards, the warnings and instructions given to the plaintiff regarding the use of her arm after the operation were inadequate. (111 Ill. App. 3d 169, 171.) The jury was instructed to apply a local standard of care and returned a verdict in favor of the defendant. (111 Ill. App. 3d 169, 175.) Considering arguments similar to those made in the instant case, the *Hunter* court held that the instruction was proper, noting that the local standard has long been the law in Illinois and that if national standards existed for the use of a particular surgical procedure, local standard language would be irrelevant, but not prejudicial. 111 Ill. App. 3d 169, 176.

However, our supreme court recently decided the case of *Purtill v. Hess* (1986), 111 Ill. 2d 229, which limited the application of the local standard. The issue in *Purtill* was whether a doctor's affidavit in a summary judgment proceeding demonstrated knowledge of the required standard of medical care in a malpractice action. (111 Ill. 2d 229, 243.) In his affidavit, the doctor admitted a lack of knowledge of the standard of care applicable to physicians in the community or similar communities in which the defendant practiced. (111 Ill. 2d 229, 244.) The trial court held that the plaintiff failed to demonstrate that the witness was familiar with the proper medical practice. (111 Ill. 2d 229, 244.) On appeal, the plaintiff urged our supreme court to reconsider, in light of modern medical practice, the appropriateness of the local standard. (111 Ill. 2d 229, 245.) Although refusing to reconsider and abolish the local standard instruction, the *Purtill* court reversed, noting that an expert need not be familiar with the practice in a particular community in cases where a minimum uniform standard exists and the expert is familiar with that standard. 111 Ill. 2d 229, 249-50.

The court stated that "[w]hatever may have been the original reason for the rule, we recognize that there are today relatively uniform standards for the education and the licensing of physicians. Also, there is no reason why physicians in a rural area should not possess a

degree of competency similar to that possessed by physicians in urban areas." (111 Ill. 2d 229, 246.) The court further stated that if, in cases post-*Purtill*, "there are certain uniform standards that would be applicable to a given situation regardless of the locality, then the lack of familiarity with the practice in a particular locality will not disqualify an expert." (111 Ill. 2d 229, 247.) However, acknowledging the continued validity of the "locality" rule (111 Ill. 2d 229, 247), the court went on to state that "if *conditions and facilities that are available are relevant*, then before an expert can express an opinion as to a physician's conduct, he must be acquainted with accepted standards of care under similar circumstances." (Emphasis added.) 111 Ill. 2d 229, 247.

In the instant action, it is uncontested that a national standard of care was applicable to defendants. We note that this is a uniform, minimum standard. Therefore, reference to a "local" standard was improper, especially in light of the fact that there is no issue regarding available "conditions and facilities." (See *Purtill v. Hess* (1986), 111 Ill. 2d 229, 247.) Accordingly, the court is directed on remand to apply a national standard of care absent any evidence to the contrary.

■ Plaintiffs finally contend that the testimony of Joan's treating physicians, Drs. Menet and Dominguez, was a violation of the physician-patient privilege pursuant to *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, *appeal denied* (1987), 113 Ill. 2d 584, and should have been barred by the court. Defendants respond that *Petrillo* does not support barring testimony of physicians at trial. We disagree.

In a case of first impression, *Petrillo* confronted squarely the issue of whether an interview between defense counsel and a plaintiff's treating physician, without the knowledge of the plaintiff, violates the physician-patient privilege. The *Petrillo* court held that the public policy in protecting the confidences of the physician-patient relationship strongly favored control over a defendant's right to interview a plaintiff's treating physician. (148 Ill. App. 3d 581, 587-88.) The court stated that this public policy was reflected in the code of ethics adopted by the medical profession and the fiduciary relationship which exists between a patient and his treating physician. (148 Ill. App. 3d 581, 588.) Although the court recognized that by filing a lawsuit, a plaintiff implicitly consents to his physician's releasing medical information related to the condition he has placed at issue, it stated that this implicit consent is necessarily limited to the release of relevant information pursuant to court-authorized discovery. (148 Ill. App. 3d 581, 591.) The court concluded that any discussions between defense

counsel and a plaintiff's treating physician should be conducted pursuant to the rules of formal discovery only. 148 Ill. App. 3d 581, 610.

We believe that the reasoning and holding of *Petrillo* is sound, and we adopt it here. While *Petrillo* did not expressly state that the fruits of such unauthorized interviews should be barred from being introduced, allowing such testimony to stand would render the *Petrillo* holding hollow and meaningless. We therefore further hold that barring the testimony of a plaintiff's treating physician is an appropriate sanction to protect the physician-patient privilege from defense interviews outside formal discovery. While an order barring the testimony or evidence resulting from such unauthorized conferences would not remedy the breach of trust addressed by *Petrillo*, it would nevertheless be an appropriate sanction to protect the patient's confidences and to preclude such conferences from taking place, which was in fact the goal sought by that court.

■ We note that in *Petrillo*, defense counsel could not identify a single piece of information or evidence that he would be able to obtain through a witness interview that he could not obtain through conventional methods of discovery. (148 Ill. App. 3d 581, 605-06.) Similarly, in the instant case, defendants obtained nothing through their interview of Joan's treating physicians that they could not have obtained through regular discovery methods. The fact that a party may obtain the same information through formal discovery as can be obtained informally *supports* the use of discovery *when it is necessary to protect a privileged communication,* such as between a physician and patient. Discussion of the patient's confidences under circumstances other than through formal discovery is potentially harmful to the interests of the patient in that the physician might disclose intimate facts regarding the patient which are unrelated and irrelevant to the mental or physical condition placed at issue in the lawsuit. (148 Ill. App. 3d 581, 595.) A plaintiff should be allowed to protect his physician-patient privilege *before* it is compromised. Requiring utilization of formal discovery procedures places the plaintiff in a position to object to irrelevant inquiries. Court supervision would protect the interests of both parties.

■■ ■ Defendants nonetheless contend that *Petrillo* should be applied prospectively only and should not be used to support reversal of the instant case since the *Petrillo* decision was rendered after the instant case was decided.

A decision should be given prospective application only when it changes existing law. (*Torres v. Walsh* (1983), 98 Ill. 2d 338.) Illinois law is in conflict on this issue. Although an attorney may interview a

nonparty witness without the consent of the opposing party (see *People v. Smith* (1967), 90 Ill. App. 2d 310), the physician-patient privilege has long been codified in Illinois. (See Ill. Rev. Stat. 1985, ch. 110, par. 8—802:) *Petrillo* does not clearly change existing law.

██ We believe that Drs. Menet and Dominguez should have been barred from testifying at the initial trial of this cause. We further believe that in order to protect Joan's physician-patient confidence from being compromised, defendants should be barred from calling Drs. Menet and Dominguez to testify on retrial, and any future contact between defendants and Joan's treating physicians must be conducted through formal discovery consistent with *Petrillo* and the views expressed above.

Accordingly, this case is reversed and remanded to the trial court with instructions that plaintiffs be granted a new trial.

Reversed and remanded.

DUNN and NASH, JJ., concur.