LINDA SUTTON, Plaintiff-Appellant and Cross-Appellee, v. LARRY OVERCASH *et al.*, Defendants-Appellees and Cross-Appellants.

Third District   No. 3—92—0657

Opinion filed November 2, 1993.

Benassi & Benassi, of Peoria (Patricia Benassi, of counsel), for appellant.

John A. Bernardi, of Pekin, for appellee Larry Overcash.

Nile J. Williamson, of Peoria, for appellee St. Mark's Court OB/GYN Associates, S.C.

JUSTICE STOUDER delivered the opinion of the court:

The plaintiff, Linda Sutton, filed a two-count complaint against the defendants, Dr. Larry Overcash, M.D., and St. Marks Court OB/GYN Associates, S.C. (St. Marks), alleging battery and intentional infliction of emotional distress. The jury returned a verdict in

favor of defendant St. Marks on both counts and in favor of defendant Overcash on the battery count. The plaintiff was awarded $12,000 in damages on the count of intentional infliction of emotional distress against Dr. Overcash. The plaintiff appeals, claiming that irrelevant and prejudicial evidence was erroneously admitted and that certain conduct of defense counsel denied her a fair trial. St. Marks cross-appeals, claiming that plaintiff's cause of action is precluded by the Workers' Compensation Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.1 *et seq.*) and the Illinois Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 1—101 *et seq.*). Dr. Overcash also cross-appeals, claiming that the evidence was insufficient as a matter of law to support a cause of action for intentional infliction of emotional distress. Because we agree with the plaintiff that she did not receive a fair trial, we reverse and remand the cause for a new trial.

## I. FACTUAL BACKGROUND

The facts underlying the plaintiff's complaint involve alleged harassing acts committed by defendant Overcash when he was one of her employers. A total of 26 witnesses were called to testify in this case. For brevity's sake, we summarize only the testimony of the plaintiff, her psychiatrist, and Dr. Overcash. Suffice it to say that both sides called numerous witnesses to corroborate their testimony in some manner.

The plaintiff testified that she began working for Dr. Harry Ores as a medical assistant in May 1974. Dr. Ores is a specialist in obstetrics and gynecology. According to the plaintiff, she and Dr. Ores had an excellent working relationship characterized by mutual admiration and respect. In addition to her duties as a medical assistant, the plaintiff also ran personal errands for Dr. Ores, which included purchasing food, clothes, and tickets for him, and washing his lab coats. In late 1985 or early 1986 the plaintiff also began doing extra cleaning work around the office for which Dr. Ores paid her an extra $100 per month. Additionally, Dr. Ores occasionally had plaintiff drive to Chicago to place bets on horses. Dr. Ores would give the plaintiff $50 for expenses and between $200 and $300 to bet.

During the time the plaintiff worked for Dr. Ores, other doctors sometimes worked in the same offices. In the late 1970's Dr. Robert Thompson shared office space with Dr. Ores. The plaintiff testified that she did not have any difficulty working with Dr. Thompson. Dr. Dan Nord worked in the office for six to nine months in the

early 1980's. Dr. Nord was hired to do the ultrasound in the office. He worked on Thursdays only, and the plaintiff assisted him with doing sonograms. Dr. Nord trained the plaintiff in sonography while he was there, and the plaintiff assumed responsibility for doing ultrasound after he left. The plaintiff testified that she had no problems working with Dr. Nord.

The plaintiff began to increase her skills in sonography. She took an advanced training course in Scottsdale, Arizona, and also subscribed to journals and bought ultrasound books. The plaintiff testified that ultrasound is a burst of energy that travels through a media such as a bladder or tissue and produces a black and white image on a screen. The process is used to diagnose pregnancy and also possible abnormalities in fetuses. The process can also be used to predict the sex of a child. The plaintiff testified that she was 100% accurate in predicting the sex of children and that she was proud of this record. According to the plaintiff, Dr. Ores was "excited" about her sonography work.

The plaintiff testified that she first met defendant Overcash in the early 1980's when he was a medical student. Overcash worked with Dr. Ores for approximately six to ten weeks. At that time, the plaintiff had very little contact with Dr. Overcash and had no difficulty getting along with him. In early 1986 Dr. Ores informed the plaintiff that Dr. Overcash was going to be joining him in his practice. The plaintiff was happy for Dr. Ores because she knew he had been looking for a partner for a long time. The plaintiff claimed she had no negative feelings about Dr. Overcash joining the practice. Dr. Ores told the plaintiff that Dr. Overcash would be starting in the summer of 1986, and that he would be coming in as a full partner. Dr. Ores further told the plaintiff that she went with the practice and that her job was secure. Dr. Ores and Dr. Overcash formed a corporation called St. Marks Court OB/GYN Associates, S.C., in which each was a 50% shareholder.

The plaintiff testified that when Dr. Overcash began working at the office, she did not treat him any differently than she treated Dr. Ores. However, four to six weeks after he joined the practice she began having problems with him. The plaintiff testified that, initially, Dr. Overcash would approach her daily and ask her to go have a drink with him. He wanted her to go to a happy hour with him during working hours. The plaintiff declined all of the invitations. On another occasion, the plaintiff was having lunch with Linda Whitlatch, the office manager, across the street from the office at the Ramada Inn. Dr. Overcash showed up and sat down at

their table. Dr. Overcash told the two women that a friend from out of town who had a lot of problems was staying with him. Dr. Overcash's wife was out of town, and he wanted to know if the two women would come over for a cookout. They both declined, and he then asked them to stop by for a drink if they did not want to come to the cookout. They both told him that they were going home.

The plaintiff also recalled another incident in which she and Linda Whitlatch were going for a walk in downtown Peoria after work. Dr. Overcash soon began to follow them, caught up with them, and asked if they would like to join him for a drink. Both of the women declined the invitation. The plaintiff testified that these invitations made her uncomfortable, because Dr. Overcash had trouble taking "no" for an answer. The plaintiff talked to Dr. Ores about the problem, and Dr. Ores told her to ignore it. Even after the plaintiff spoke to Dr. Ores, Dr. Overcash continued to ask her out to happy hour and to dinner.

The plaintiff then recounted other things that Dr. Overcash did that made her feel uncomfortable. Dr. Overcash began to frequently touch the plaintiff with a metal tape measure that was used to measure fundal heights of pregnant women. This behavior started approximately four to six weeks after Dr. Overcash joined the practice. Previously, the only objects Dr. Overcash had touched the plaintiff with had been rubber bands. Dr. Overcash would sit in the lab area and shoot rubber bands at the plaintiff's bottom when she walked by. The contacts with the tape measure occurred daily. The plaintiff stated that she began to feel uncomfortable when she realized the touching was intentional and not accidental. Dr. Overcash would tap the plaintiff on the shoulder with the tape measure when he was talking to her, and then would run it down over her breasts. He would also run the tape measure down the middle of the back to her buttocks. Another time, when the plaintiff was bent over in the sonogram room, Dr. Overcash attempted to stick the tape measure between the upper part of her legs. The plaintiff told him, "knock it off" and asked if he had anything better to do. He replied, "no."

One time, Dr. Overcash called the plaintiff over to where he was sitting. When she asked him what he wanted, he reached out and tapped her breasts with the tape measure and ran it over them. She pushed it away, backed up, and again asked him what he wanted. He replied "nothing" and began to smirk. Eventually, the plaintiff began to cross her arms whenever Dr. Overcash wanted to speak to her. When he asked why she was doing this, she told him it was because she did not know what he was going to do. He

laughed at this response. The plaintiff would also respond to the tape measure incidents with comments such as, "knock it off," "leave me alone," "grow up," and "don't you have anything better to do?" These incidents continued through the middle of 1987.

The plaintiff testified to various other aspects of Dr. Overcash's behavior. About five to six weeks after Dr. Overcash joined the practice, he was going in to an examination room to examine a pregnant patient. He came out of the room and asked the plaintiff for a rubber glove and some jelly for a pelvic exam. The plaintiff brought these items to Dr. Overcash, and, in front of the patient, he replied, "I thought you were going to make me do this exam like I used to do in the back seat of my '57 Chevy, bare-handed." Dr. Overcash then laughed, and the plaintiff was shocked.

On another occasion the plaintiff and Dr. Overcash were with a patient and her husband in an exam room. The plaintiff was moving around the room doing various things rather quickly and the patient's husband said, "Gee, you are fast," and Dr. Overcash replied, "Yeah, that's what all of her old boyfriends say about her."

The plaintiff testified that she met with Dr. Ores to tell him about the things that were going on between her and Dr. Overcash. The first of these meetings was at the Country Bee Restaurant in Kickapoo. The plaintiff, Dr. Ores, and Linda Whitlatch were at the meeting. The plaintiff related to Dr. Ores the various improper comments Dr. Overcash was making and also told him about the continued touching with the tape measure. The plaintiff complained that she found these incidents embarrassing. Dr. Ores told her to ignore it. Dr. Ores further explained to the plaintiff that she was frustrating Dr. Overcash because he was not getting any attention at home. According to Dr. Ores, the nurses at the hospital gave Dr. Overcash plenty of attention and he was frustrated because the plaintiff was not similarly feeding his ego.

Following the meeting at the Country Bee, the plaintiff and Dr. Overcash continued to have problems. An altercation occurred when Dr. Overcash asked the plaintiff to get a report for him. According to the plaintiff, the three people who worked in the front of the office were in charge of those reports and it was not her job. The plaintiff, who was busy doing other things, looked for the report and could not find it. Dr. Overcash asked in an angry voice where the report was, and the plaintiff explained that she could not find it and that it was not her job to get it. Dr. Overcash grabbed her by the arm and yelled, "Well, I am making it your job." The plaintiff found the report and gave it to him. Dr. Overcash later came up to

her and told her that he did not like her attitude. The plaintiff had been crying and he told her she looked like a mess. She tried to leave, but Dr. Overcash informed her that she did not have any vacation or sick days. The plaintiff testified that she actually did have vacation and sick days. Dr. Overcash later came up to her, put his arm around her and told her that he "owed her one." He said that he would take the plaintiff out to dinner the next week when his wife was out of town. The plaintiff told him that he did not owe her anything. The plaintiff again complained to Dr. Ores, and he told her that he would handle it and that she should not worry.

On another occasion, Dr. Overcash ordered the plaintiff to cut his hair. The plaintiff knew the barber who worked in the office downstairs, Les Hager, and she used his shop occasionally to cut hair. She told Dr. Overcash that she did not want to cut his hair, but he told her, "You can do it. There is nothing to it." The plaintiff told Dr. Ores that she did not want to cut Dr. Overcash's hair, and Dr. Ores told her, "No problem. Just leave after work when you are done." Two days later, Dr. Overcash waited by the door at the end of the day and told the plaintiff, "You can give me a haircut tonight. We are finished." The plaintiff called Les Hager and asked him to stay around while she cut Dr. Overcash's hair. Six weeks later, Dr. Overcash again ordered the plaintiff to cut his hair. The plaintiff asked two other employees, Linda Whitlatch and Tammy Deemie, to go with her. After the haircut, Dr. Overcash offered to pay the plaintiff. She declined. He then threw a $20 bill at her chest. It fell on the floor and she handed it back to him. He then tried to stick the $20 bill down the front of her blouse. She again gave it back to him, and he left it on the desk.

One time, when the plaintiff got her paycheck it was not signed. She took it to Linda Whitlatch and asked her to get it signed. Whitlatch took it to Dr. Overcash, then reported back to the plaintiff that Dr. Overcash said that if she wanted her paycheck signed, she had to come in and ask him to do it. When the plaintiff went into his office and asked him to sign the check, he asked her if she thought she deserved it. She said, "Yes," and he replied that he could make the check out for any amount he wanted.

The plaintiff testified that Dr. Overcash also regularly touched her with his hand. This began in 1986 and continued until November 1987. One incident occurred when the plaintiff was bent over in the ultrasound room. Dr. Overcash smacked her on the rear and commented, "Gee, you are firm." The plaintiff told him to knock it off. On another occasion, the plaintiff was bent over in the lab area

and Dr. Overcash smacked her on the rear and said, "Hold that position. That's the position I like best." The plaintiff testified that Dr. Overcash would routinely smack her on the rear when she was walking down the hall or when she was bent over working on something. The plaintiff discussed this behavior with Dr. Ores during a meeting at the Country Bee. Dr. Ores's response was, "He is frustrated. He wants in your pants. Ignore him."

The plaintiff also had problems with Dr. Overcash in the sonogram room. The sonogram room was dark, with the only light coming from the TV monitor on the sonogram machine. When the plaintiff was performing sonograms on patients, Dr. Overcash would come up behind her and press the front of his body against the back of hers. On one occasion, the plaintiff tried to push him back away from her with her elbow. Another time she asked him if he wanted to do the scan himself, to which he replied, "No, you are doing fine." When she told him that he could view the monitor from the other side of the table, he left the room. The plaintiff testified that she has worked for six or seven other gynecologists, and none of the others have ever pressed themselves against her while she was doing a sonogram. The plaintiff testified that other doctors would stand on the opposite side of the table.

The plaintiff further testified regarding various comments of a sexual nature that Dr. Overcash made to her. Once, after the plaintiff had put a young, attractive patient in an examination room, Dr. Overcash turned to the plaintiff, pushed down on his groin area like he had an erection, and said, "down, boy, down," and then proceeded to laugh. After Dr. Overcash examined the patient, he came out of the room, cocked his finger like a gun, blew on his fingers and said, "She's hot." The plaintiff testified that Dr. Overcash made similar gestures at least a dozen times. When the plaintiff told Dr. Ores about this behavior, he told her that Dr. Overcash had a problem and that she should ignore it. He also said that he would take care of it.

The plaintiff also testified regarding incidents with Dr. Overcash's sister and sister-in-law. On one occasion, Dr. Overcash was reprimanding his sister, Gloria Davis, for something she had done. Davis worked in the back of the office with the plaintiff. After being reprimanded, Davis dropped to her knees, threw her arms around his legs, and began kissing him above the knees. While she did that, Dr. Overcash said, "higher, higher," and the two of them began to laugh. The plaintiff told them that they were both sick. When Davis was scheduled to have a hysterectomy performed by

her brother, she wrote a poem to him and placed it inside a condom that she tied to her thigh. The last line of the poem was, "Enjoy. This will be the last time you play with my twat." On another occasion, Dr. Overcash told the plaintiff that he was tired. She asked if he had been up all night delivering a baby. He responded that, no, his wife's sister had come over and spent the night and slept in between him and his wife. The plaintiff told him that he was sick, and he responded that she had a sick mind and that she was the sick person. He said that neither he nor his wife were willing to give up their side of the bed.

The plaintiff further testified regarding other comments Dr. Overcash made to her. Once, he called her into his office and asked her to sit down. She sat down on a leather sofa in his office, and he asked her if she liked it. She responded that it was "nice," and he commented, "You are into leather, aren't you?" She left the room. Another time, the plaintiff was in the sonogram room with a patient and she was pointing out parts of the body to the patient. She pointed out the testicles and penis of the fetus to the patient, and Dr. Overcash commented, "Yeah, that's the part you like looking at best." Dr. Overcash also had a habit of yelling, "Linda, I need you in here for sex," whenever he needed her to perform a sonogram. When he first began working there, Dr. Overcash would just say, "Linda, I need a sonogram," but he changed this to, "I need you for sex" in 1987. No other obstetrician had ever asked her to perform a sonogram in this manner. The plaintiff complained to Dr. Ores, and he told her that her job was secure, and that nothing was going to happen to her.

Dr. Overcash went on vacation in early 1987, and the plaintiff testified that, while he was gone, the office was a pleasant place to work again. The plaintiff stated that, during this period, she was not depressed and she did not go home crying. When Dr. Overcash was in the office, the plaintiff claimed that she was severely depressed and had uncontrollable crying spells. She had trouble sleeping and was anxious and nervous. When Dr. Overcash returned from vacation, the inappropriate comments to the plaintiff continued. Once, the plaintiff was bent over in an exam room taking something out of a drawer. Dr. Overcash came up behind her and said, "This is the view I missed the most while I was gone." Another time, when Dr. Overcash had just returned from lunch, he asked the plaintiff what the letters on her license plate stood for. She responded that she did not know. He said, "I know what they

stand for: tight, juicy vagina." The plaintiff told him that he was sick, and he laughed about it.

The plaintiff began to try to avoid Dr. Overcash whenever possible. She devised a warning system with a co-worker, Sheryl Shelton, in which Shelton would start tapping with a pencil if she saw Dr. Overcash coming up behind the plaintiff. The plaintiff also began to spend more time in the front of the office where there were other people around, and she would try to avoid Dr. Overcash if she knew he was coming down the hall.

In May 1987, the plaintiff took a vacation. When she returned, she noticed Dr. Overcash's behavior becoming more aggressive and hostile towards her. He used a more harsh and demanding tone of voice when he would ask her to do something and began to find fault with the way she performed sonograms. He began telling her that her fetal measurements were wrong. When she asked how he wanted them done, he responded, "It took me eight years to become a doctor. I can't teach you in one afternoon." Also, when Dr. Overcash wanted to do a sonogram himself, he would shove the plaintiff out of the way instead of asking her to move. Dr. Overcash also told her that she could no longer predict the sex of children because she had misdiagnosed a patient. She asked the patient's name, and he would not tell her. He said he found out from a nurse at the hospital; he would not tell her the name of the nurse. The plaintiff told Dr. Ores about this. Dr. Ores told her that she had not incorrectly predicted the sex of a child, and that if she did, he would be the first to know about it. He said the nurses would tell him because the plaintiff had never been wrong.

Dr. Overcash continued to criticize the plaintiff's work with the sonogram equipment. Except for one occasion, he neither taught her how to do it differently nor gave her any instruction. The plaintiff believed that Dr. Overcash was doing this to humiliate her. She testified that she took a lot of pride in her ultrasound work, and that she had felt competent doing it for 11 years. She felt awful when Dr. Overcash began to discredit her work. The plaintiff spoke to Dr. Ores about the problem, and he told her that she was performing sonograms correctly, and that she should continue to do it the way she had always done it. He told her to ignore Dr. Overcash when he would shove her out of the way.

When Dr. Overcash took another vacation, the plaintiff again met with Dr. Ores to complain about Dr. Overcash's behavior. Dr. Ores told her that he knew how she felt because Dr. Overcash had humiliated him at the hospital. Dr. Ores told the plaintiff that Dr.

Overcash did not respect anyone but himself. Dr. Ores further stated that Dr. Overcash did not even respect him even though he gave him 50% of his practice, and that Dr. Overcash had made $200,000 his first year there. When Dr. Overcash returned from vacation, Dr. Ores told the plaintiff that Dr. Overcash was acting much better and was very appreciative of what Dr. Ores had done for him.

Nevertheless, the relationship between the plaintiff and Dr. Overcash did not improve. On one occasion, the plaintiff was in the lab area, bent over a microscope. Dr. Overcash attempted to hit Linda Whitlatch on the bottom, but she blocked his hit. He then swatted the plaintiff on the bottom, and the slap was so hard that it propelled her forward and she hit her head on a cabinet. The plaintiff was in her menstrual cycle at the time, and the slap moved her sanitary napkin forward. The plaintiff was humiliated, and she commented to Whitlatch, "He just shoved my pad clear up to my front." Dr. Overcash responded, "Oh, I know that hurt. My hand is red. Look at the palm of my hand." The plaintiff went to the bathroom and cried. When she left the bathroom, Dr. Overcash was waiting by his office door. He told her, "Look, I'm sorry. I know that hurt. My hand hurts; it stings." She told him to leave her alone. Dr. Ores later spoke to the plaintiff about the incident. He said that Tammy Deemie told him that Dr. Overcash hit the plaintiff, who acknowledged that it was true, and said the incident had humiliated and embarrassed her. The plaintiff stated that she had not done anything to provoke the slap, that she was busy working at the time, and she was not being loud.

After this incident the plaintiff requested a leave of absence from Dr. Ores. Dr. Ores told her that she could not have that, but that she should use her vacation days instead. The plaintiff had a week of vacation time that she could use, but Dr. Ores did not want her to take a whole week off. He suggested that she take off five consecutive Fridays. The plaintiff scheduled the Fridays off, but then found out that Dr. Overcash was opposed to this arrangement. Linda Whitlatch told the plaintiff that Dr. Overcash was unhappy with her taking the five Fridays off, and that she could never do it again. Dr. Ores told the plaintiff it was okay, and she did take the time off. The plaintiff testified that other employees regularly took their vacation days one day at time.

In November 1987, the plaintiff interviewed for another job with Nord Obstetric and Gynecology in Bloomington. One of the doctors there was Dr. Daniel Nord, the doctor who taught the plain-

tiff sonography in the early 1980's. The plaintiff was offered a job there and she accepted it. The plaintiff was making $13 an hour with Dr. Ores and Dr. Overcash, but would only make $8 an hour with Dr. Nord. She would be working four to six hours a week less at the new job. There would also be less benefits and more expenses involved with the new job. The plaintiff would not have a dental plan, her medical deductible was higher, she did not have prescriptions paid for, she had to pay for her own uniforms, and she did not have a pension. Additionally, she had the expenses involved in commuting to Bloomington. She also went from having four weeks of vacation to only one.

The Monday after she got the job offer, the plaintiff informed Dr. Ores that she would be leaving to take another job. Dr. Ores responded, "Don't tell me that. Don't tell me that." The plaintiff began to cry, and Dr. Ores asked her how much money she was currently making. She told him it was between $19,000 and $20,000. He offered to give her $25,000, but she told him that money was not the problem. She was crying uncontrollably, and she told him that the problem was in the other room and pointed to Dr. Overcash's office. Dr. Ores left to talk to Dr. Overcash, and returned in a few minutes saying that the plaintiff could have the raise but that Dr. Overcash did not like it. The plaintiff again told him that money was not the problem, but Dr. Ores said that he had to get back to work and that they would talk later. The plaintiff went back to work and noticed that Dr. Overcash was very angry. He was doing his own sonograms and was moving his own patients from room to room. Within the hour, Dr. Ores learned that Dr. Overcash was doing his own sonograms and moving patients into rooms on his own. Dr. Ores told the plaintiff that he could not have this, that the deal was off, and that it was best that she go.

Dr. Ores then called the plaintiff at home that same night. He told her that he had just had a meeting with Dr. Overcash and that Dr. Overcash agreed to give her a raise. Dr. Ores suggested that she take the raise and just let Dr. Overcash go in one ear and out the other. The plaintiff told Dr. Ores that she could not do that, that she had been through enough, and that Dr. Overcash had driven her crazy. She then complained to Dr. Ores that he had allowed all of this to take place. She also told Dr. Ores that she was upset because he had promised her that they would retire together. He told her that it was best that she go, that he could no longer protect her, and that now he could retire and not have to worry about her.

After she gave notice that she was leaving, the plaintiff was given the silent treatment at work by both Dr. Overcash and Dr. Ores. They would both ask other people in the office to do things rather than the plaintiff even when she was available. There was a going-away party scheduled for the plaintiff, but she cancelled it because she was not happy about why she was leaving.

The plaintiff testified that the instances of inappropriate behavior by Dr. Overcash did not cease even after she had given notice that she was leaving. Once when the plaintiff was in the lab working at a microscope, Dr. Overcash walked up with a book in his hand and sat down on a nearby stool. He was looking through the book and talking to Dr. Ores. He came to a page with pop-up male sexual organs and said to Dr. Ores, "Look, Harry. Look at the page Linda has got marked. But this is too small for her." Dr. Ores motioned Dr. Overcash to be quiet. The plaintiff also described another instance in which Dr. Overcash came up to her with a Christmas card in his hand and asked if she had sent it to him. The plaintiff replied, "no," and he handed the card to her. The card showed a silhouette of a nude man and woman, and on the inside it said, "To all the good nights." The plaintiff again told him that she did not send the card and then walked away. Dr. Overcash was laughing.

On the plaintiff's next to last day of work, she had one last encounter with Dr. Overcash in the sonogram room. She was in the sonogram room with Dr. Overcash, a patient, and the patient's sister. The woman who had been hired to replace the plaintiff as sonographer, Joan Shafer, was also present. The plaintiff was assisting Shafer with the sonogram by putting information into the computer. She inquired whether Shafer had seen the fetus breathe. Dr. Overcash then shoved the plaintiff into a table and said, "What are you doing? You know fetuses don't breathe before 31 weeks." The plaintiff left the room and began to cry. In the plaintiff's experience, fetal respiration was apparent from 15 weeks on up.

After the plaintiff left her job, she suffered from depression and cried frequently. She was also worried about her new job because she was beginning on a three-month probationary period. She was also worried because she had a son to raise, and she did not know what she would do if the new job did not work out. In June 1990, the plaintiff began treatment with a psychiatrist in Bloomington, Dr. Robert Chapman. At the time of the trial, the plaintiff was continuing to see Dr. Chapman.

Dr. Chapman testified that he has been treating the plaintiff since the summer of 1990. Since that time he has seen her 13

times. When the plaintiff first came to Dr. Chapman her symptoms were emotional distress with some depression and anxiety. Dr. Chapman's original working diagnosis of the plaintiff was stress-related anxiety and depression. After subsequent sessions with the plaintiff and repeated mental status examinations, the diagnosis evolved to post-traumatic stress syndrome. This is a stress disorder that arises after a trauma. The trauma can be a single incident or a series of incidents or stressful situations over a period of time in which the patient feels helpless and hopeless and causes the patient to develop intense feelings of anger, anxiety, and depression. Further, Dr. Chapman stated that it was not unusual that the plaintiff did not seek psychiatric treatment for two and a half years after the initial stress. Dr. Chapman stated that it was his opinion, based on a reasonable degree of medical certainty, that there was a direct causal connection between the events that happened to Linda Sutton at work and her current psychological problems. This included both the problems with Dr. Overcash and the failure of Dr. Ores to help her. The treatment she was undergoing with Dr. Chapman was supportive psychotherapy. Dr. Chapman's opinion was that it would take between 6 and 18 months of treatment for the plaintiff to deal with the problem, but that some of the psychological scars will remain for the rest of her life.

Dr. Overcash testified that he became acquainted with the plaintiff when he worked for Dr. Ores as a medical student. At that time they had a good relationship. Dr. Overcash said that the plaintiff was always glad to see him when he came to the office and was always complimentary. Dr. Overcash testified that the plaintiff was "touchy," and would come up to him and straighten his tie, and say things like, "you have the hardest little body." Dr. Overcash was embarrassed by these types of comments. Dr. Overcash also remembered the plaintiff coming up to him and kissing him when he brought his mother to the office to meet Dr. Ores. After Dr. Overcash joined Dr. Ores on a full-time basis, the plaintiff continued to straighten his clothes and to touch him. Specifically, the plaintiff would press her breast against Dr. Overcash's elbow when he was looking at sonogram reports. Dr. Overcash testified that he was embarrassed and uncomfortable with this contact, but that after awhile he got used to it. He stated that he did nothing to invite this contact. Dr. Overcash also recalled an occasion on which the plaintiff exposed part of her breast to him. The plaintiff walked up to him and pulled her sweater down, exposing part of her breast. Dr. Overcash could see all of the breast except for the nipple. She

pointed to some small, red blotches and asked him what they were. He responded that he did not know and advised her to see a dermatologist. Dr. Overcash further testified that the plaintiff often brought in catalogs for fur coats, diamonds, and jewelry, and would point out items that she wanted Dr. Overcash to buy for her. Dr. Overcash recalled that once, after the plaintiff received her Christmas bonus, she stated to him, "Thanks for the bonus, but I still want the fur coat." In one of these catalogs, the plaintiff circled a picture of a fur coat and wrote next to it, "Dr. Overcash is buying this for Linda." She then left it laying open to that page. Dr. Overcash stated that the plaintiff was "not afraid to dress suggestively," often leaving her buttons unbuttoned. When she did this, Dr. Overcash could occasionally see her cleavage and bra.

Dr. Overcash admitted that he asked the plaintiff to cut his hair. He testified that he had known she was a stylist since he met her, and he was aware that she would cut Dr. Ores's hair and trim his beard. When he first asked her for a haircut she replied, "sure." After she cut his hair the first time, he did not pay her because he did not have any money with him. Approximately four to six weeks later he again asked the plaintiff to cut his hair. After she finished the cut, he attempted to pay her $20. She put her hands behind her back and he tossed the $20 at her chest. After it fell to the floor, he picked it up and put it on the front of her shirt. He then thanked her and left.

Dr. Overcash also testified that he did ask the plaintiff and Linda Whitlatch to come over to his house when his wife was out of town and a divorced friend was coming over. His intent was to try to cheer up his friend. He testified that this was the only time he asked the plaintiff to go anywhere with him. With regard to the incident in which he "followed" the plaintiff and Linda Whitlatch downtown, Dr. Overcash testified that he was looking for the post office when he saw the two of them walking around. He parked his car, got out, and asked them where the post office was. He only spent a few minutes with them.

Dr. Overcash gave his own versions of the various matters complained of by the plaintiff. With regard to the tape measure, he testified that he sometimes used it as "an extension of his hand" to tap people on the shoulder in order to get their attention. Dr. Overcash stated that he was not really aware of doing this, and he stopped when Dr. Ores told him to. He denied touching the plaintiff on the breasts, buttocks, or between the legs. With regard to where he stood in the sonogram room, Dr. Overcash testified that he

would have to stand on the same side of the table as the plaintiff if the patient's family was standing on the other side of the table. He would also have to stand near the plaintiff if the sonogram was being done for diagnostic purposes. He denied ever deliberately pressing his body against hers for the purpose of sexual arousal or gratification.

Dr. Overcash testified that he only struck the plaintiff on the rear on one occasion. The plaintiff was looking at a slide of a patient's vaginal secretions under a microscope. According to Dr. Overcash, the plaintiff was making comments such as, "Yuck, stinky. She has trichomonas and yeast." Dr. Overcash was upset because one of Dr. Ores's patients was standing at the front desk and was looking at the plaintiff with a startled look on her face. The plaintiff continued to make the comments, and Dr. Overcash told her to be quiet. He swung his hand back to get her attention. At the same time, Linda Whitlatch was walking past, and Dr. Overcash's hand hit Whitlatch's hand. He then continued to swing and his hand struck the plaintiff on the rear. He stated that he "just barely tapped her." The plaintiff then jumped up because he startled her. Dr. Overcash told her he was sorry and asked if she hit her head. She replied, "No. You just drove my Tampax up my ears." The plaintiff was laughing at the time. Dr. Overcash did not see her crying or in a depressed state later in the day.

Dr. Overcash recalled the conversation regarding the license plates differently than the plaintiff. Dr. Overcash testified that the conversation took place in August 1987, after he had just leased a new car. The license plate on the car was DOE 921. The plaintiff asked Dr. Overcash, "What does DOE stand for? Does that mean you have a lot of dough?" Dr. Overcash laughed and indicated that it was probably DOE because he had leased the car and to the leasing agency he was a John Doe. He then asked the plaintiff what her license plate letters were. She responded, "TJV." When he asked her what that stood for, she replied, "Terrific jugs and vagina," and thrust her chest out. They both laughed and then the plaintiff asked Dr. Overcash what he thought. He laughed and said, "Well, it could mean tight, juicy vagina." The plaintiff laughed at this response.

Dr. Overcash further denied that his sister had kissed his legs and that he had exclaimed, "Higher, higher." He also denied pushing on his crotch and saying, "Down, boy," and also blowing on his fingers and saying, "She's a hot one." Dr. Overcash admitted telling the story about his wife's sister sleeping in bed with him and

his wife. He denied that he said that she slept in between them, and explained the reason that she slept in bed with them was that the guest room was too cold. He stated that he did not tell the story to offend or insult the plaintiff. Dr. Overcash testified that he never said that the plaintiff liked looking at the testicles and penis of male fetuses. Rather, he said that the comment he once made to a husband of a patient was that, "Linda likes it when she can see the penis because we are sure then it's a boy." Dr. Overcash also denied showing the plaintiff a pop-up picture of a penis and saying that it was too small for her.

Dr. Overcash recalled the story about a '57 Chevy differently than did the plaintiff. Dr. Overcash had to examine a patient in a small examining room that was half the size of the other rooms. He said to the patient, "I'm sorry I have to examine you in such a small area," and she laughed and replied, "I have been examined in much smaller areas than this, like in the back seat of a '57 Chevy." Dr. Overcash testified that he then related this story to other people. He told the story to the plaintiff, and also to the next patient he had to examine in the small room. According to Dr. Overcash, the plaintiff laughed and did not appear offended by the story.

Dr. Overcash testified that both he and Dr. Ores would occasionally use the phrase, "Linda, we need you for sex" as an abbreviated form of, "Linda, we need you for sex determination on the baby." One time the plaintiff raised her eyebrows when Dr. Overcash used the abbreviated phrase, so he decided to quit using it. Dr. Overcash stated that he had never used the phrase for the purpose of offending or insulting the plaintiff, and the plaintiff did not appear to him to be offended by his use of the phrase.

With regard to sonogram procedures, Dr. Overcash testified that he did have some disagreements with the plaintiff over the correct way to take pictures of the femur bone and the correct way to do a crown-rump measurement. Dr. Overcash was trained in sonography as part of his medical education, and wanted the plaintiff to use the procedures that he believed were proper. He denied ever telling the plaintiff that she was no longer allowed to predict the sex of fetuses. He did tell the plaintiff that she should not tell patients that she had never been wrong. Dr. Overcash denied that he ever shoved the plaintiff in the sonogram room. On the day when the plaintiff and Joan Shafer were both in the sonogram room, Dr. Overcash testified that he and the plaintiff had a disagreement over whether or not a biophysical profile should be done. The plaintiff then walked out of the room.

With regard to the plaintiff leaving St. Marks, Dr. Overcash testified that Dr. Ores came in and told him that the plaintiff was moving on to another job in six weeks. Dr. Overcash denied increasing the plaintiff's duties at any time prior to her notice that she was leaving. He also denied shunning the plaintiff after she gave notice. He testified that the plaintiff was very hard to find in her final weeks of her employment, and because of this he often had to do his own sonograms. According to Dr. Overcash, the plaintiff was very happy when she announced that she was leaving, but became depressed when she found out that Joan Shafer had been hired to replace her.

Dr. Overcash admitted that he had made a comment about not liking to sign the plaintiff's check, but it was not her regular paycheck he was referring to. Dr. Ores paid the plaintiff $100 extra per month to clean up the office. On one occasion, Linda Whitlatch forgot to write out the check for the cleaning. When Whitlatch later brought the check in she said, "You know, we clean too." Dr. Overcash replied, "I know. This is the check I hate to sign the most." Dr. Overcash made the comment because it was his understanding that all employees in the office took responsibility for cleaning the office. Dr. Overcash denied ever threatening to take away the plaintiff's sick days or vacation days, but he did object to her taking her vacation days one day at a time, on Fridays, because he thought it would be disruptive to the office. Dr. Overcash denied ever doing anything to the plaintiff with the intent to cause her any harm or mental anguish.

The plaintiff was recalled to the stand as a rebuttal witness. She denied exposing her breast to Dr. Overcash and asking him about a rash, kissing Dr. Overcash or asking Dr. Overcash to buy her furs or gifts. The plaintiff also denied ever refusing to do anything she was asked to do in the sonogram room.

## II. WORKERS' COMPENSATION ACT

■ Before addressing the issues raised by the plaintiff, we will consider the cross-appeals of the defendants. Defendant St. Marks raises two issues on cross-appeal. St. Marks first argues that the plaintiff's battery claim against it is barred by the exclusivity provision of section 5(a) of the Workers' Compensation Act (the Act) (Ill. Rev. Stat. 1987, ch. 48, par. 138.5(a)). St. Marks filed an affirmative defense claiming that both counts were barred by the Act, but on appeal only argues with respect to the battery count. Therefore, any issue with regard to whether the intentional infliction of emo-

tional distress count would be barred by the Act has been waived by St. Marks' failure to argue it on appeal. We disagree with St. Marks' argument that the plaintiff's battery claim is barred. The exclusivity provisions will not bar a common law cause of action against an employer for injuries which the employer or its alter ego intentionally inflicts upon an employee or which were commanded or expressly authorized by the employer. (*Meerbrey v. Marshall Field & Co.* (1990), 139 Ill. 2d 455, 564 N.E.2d 1222.) The rationale given for this rule is that, "the employer should not be permitted to assert that the injury was 'accidental,' and therefore under the exclusive provisions of the Act, when he himself committed the act." (*Meerbrey*, 139 Ill. 2d at 464, 564 N.E.2d at 1226.) It is not entirely clear from Illinois case law under what circumstances a corporate employee is acting as the "alter ego" of the corporation. However, in *Jablonski v. Multack* (1978), 63 Ill. App. 3d 908, 380 N.E.2d 924, the court cited with approval *Heskett v. Fisher Laundry & Cleaners Co.* (1950), 217 Ark. 350, 230 S.W.2d 28. In *Heskett*, an intentional injury was inflicted upon the employee by a person who was both an officer and general manager of the corporation. In this circumstance, the court held that the tort-feasor employee was acting as the alter ego of the corporation, and therefore the injured employee had the option of claiming compensation or seeking damages in a common law action. The *Jablonski* court distinguished that from the situation before it, in which the plaintiff's complaint merely alleged that the injury was caused by a manager of a restaurant which was one of several restaurants owned by the corporate defendant. The plaintiff's complaint in *Jablonski* contained no allegations that the manager was acting as the alter ego of the corporation. In the instant case, it seems clear that defendant Overcash was the alter ego of the defendant St. Marks Court. Dr. Overcash was a 50% shareholder of the corporation and was the corporation's vice-president and secretary. The corporation consisted solely of Dr. Ores and Dr. Overcash. Under these circumstances, the trial court was correct in striking St. Marks' first affirmative defense.

### III. HUMAN RIGHTS ACT

■ Defendant St. Marks also asserts by way of cross-appeal that the Illinois Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 1—101 *et seq.*) is the exclusive remedy for acts of physical and mental harassment committed by a male to a female co-employee and that the plaintiff must first exhaust her administrative remedies be-

fore pursuing a civil action. St. Marks raised the issue in a motion to dismiss and also in a motion for directed verdict at the end of plaintiff's case. This issue was addressed by the First District Appellate Court in *Pavilon v. Kaferly* (1990), 204 Ill. App. 3d 235, 561 N.E.2d 1245. The court in that case relied on the following statement from *Bailey v. Unocal Corp.* (N.D. Ill. 1988), 700 F. Supp. 396, in determining whether the Human Rights Act preempts a tort which occurs in an employment setting:

> "Where the elements of the tort require proof of nothing more than that proscribed by the Act, and where the tort merely furthers the same policies as the statute, the IHRA [Illinois Human Rights Act] will preempt the tort action. But where the tort requires more, and thereby furthers goals in addition to those addressed by the IHRA, the Act will not preempt the claim." (*Bailey*, 700 F. Supp. at 404.)

The *Pavilon* court concluded, as did the court in *Bailey*, a claim for intentional infliction of emotional distress was not preempted by the Human Rights Act because the tort of intentional infliction of emotional distress required proof of more than was required for sexual harassment and served a different policy than that served by the Human Rights Act. (Accord, *Ritzheimer v. Insurance Counselors, Inc.* (1988), 173 Ill. App. 3d 953, 527 N.E.2d 1281; *Clay v. Quartet Manufacturing Co.* (N.D. Ill. 1986), 644 F. Supp. 56.) In *Clay*, the court also held that a count that alleged battery was not preempted by the Human Rights Act. We agree that intentional infliction of emotional distress and battery both require proof of more than is necessary to state a claim for sexual harassment under the Human Rights Act. The trial court was correct in ruling against St. Marks on the motion to dismiss and the motion for a directed verdict.

#### IV. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ Defendant Overcash raises on cross-appeal the argument that the evidence was insufficient as a matter of law to support a cause of action for intentional infliction of emotional distress. The manner in which defendant Overcash has framed this argument makes it unnecessary for us to address it. Although defendant Overcash raised this argument at the pleadings stage, again at the close of plaintiff's case in a motion for directed verdict, and finally at a post-trial motion, he now concedes that he was wrong on the first two occasions and that the court correctly ruled against him. His argument now is that the only time the court erred on this issue was in denying his motion to set aside the jury verdict on count

II. Defendant Overcash's reasoning is that the plaintiff's allegations, taken as true, are sufficient to satisfy the necessary elements of the tort of intentional infliction of severe emotional distress. However, defendant Overcash claims that the allegations are only sufficient if the claims of battery are taken as true. He now argues that, since the jury ruled against the plaintiff on the battery count, only the evidence regarding the plaintiff's other allegations should have been considered in deciding the emotional distress count. Defendant Overcash argues that the evidence on these allegations, minus the claims of battery, was insufficient to support the jury's verdict, and that this court should therefore reverse the jury's verdict on count II and enter judgment in favor of him on count II. We disagree with the defendant that the jury's verdict in favor of the defendants on count I means that the evidence of physical contact could not be considered in deciding count II. The jury instructions on count I required the jury to find that the harmful or offensive contacts with the plaintiff caused her "injury." It is possible that the jury believed the contacts with the tape measure and the slapping of plaintiff's bottom did not alone cause her injury, but considered as a pattern of abuse with Dr. Overcash's other conduct did cause her emotional distress. As defendant Overcash concedes that the physical contacts with the plaintiff, along with the other conduct, constitute sufficient evidence to support a verdict in the plaintiff's favor on count II, we need not further address this issue.

### V. EVIDENTIARY ISSUES

The plaintiff argues on appeal that certain evidence was improperly introduced against her. Evidentiary rulings are within the discretion of the trial court, and, absent an abuse of discretion resulting in prejudice to the party objecting, those rulings will not be disturbed on appeal. (*Brandt v. Uptown National Bank* (1991), 212 Ill. App. 3d 621, 571 N.E.2d 531.) In reviewing a jury verdict, an appellate court need not determine that the record is free of error, but rather, need only conclude that the error claimed did not preclude the losing party from receiving a fair trial. (*Karsten v. McCray* (1987), 157 Ill. App. 3d 1, 509 N.E.2d 1376.) It is especially important to have a trial free of those errors which might influence a verdict when the evidence on the issue of liability is so close that the jury might reasonably have returned a different verdict. (*Charpentier v. City of Chicago* (1986), 150 Ill. App. 3d 988, 502 N.E.2d 385.) We believe that the evidence on the issue of liability in this case was close. The jury heard two completely different accounts of

the events that occurred between the plaintiff and Dr. Overcash during 1986 and 1987. Each side produced numerous witnesses that in some way corroborated their respective stories. Therefore, liability turned on the credibility of the witnesses, and it was vitally important that the parties were on a "level playing field" and that prejudicial error did not occur. We believe that the plaintiff has adequately demonstrated that the admission of certain evidence, together with certain improper conduct of defense counsel, denied her a fair trial.

■ The defendants were allowed to introduce evidence of the plaintiff's nine-year affair with a married man, Captain John Stenson of the Peoria police department. Stenson is black, and the plaintiff is white. The plaintiff argues that this evidence was irrelevant, inflammatory, and highly prejudicial. The plaintiff sought by way of a motion *in limine* and also by objection to have the evidence excluded. The plaintiff later renewed her objection by way of a post-trial motion. The defendants' argument to the trial court and to this court was that the plaintiff had put her mental state in issue on the emotional distress count, and therefore the defense had a right to explore other possible causes of the plaintiff's emotional distress. The flaw in the defendants' argument is that they did not have evidence that the Stenson relationship caused the plaintiff to suffer severe emotional distress. Absent this connecting link, the evidence was not relevant and was unfairly prejudicial to the plaintiff. (See *Karsten*, 157 Ill. App. 3d 1, 509 N.E.2d 1376; *Caley v. Manicke* (1961), 29 Ill. App. 2d 323, 173 N.E.2d 209, *rev'd on other grounds* (1962), 24 Ill. 2d 390, 182 N.E.2d 206.) The defendants claim that the evidence showed that the plaintiff's relationship with Stenson was "highly volatile." The plaintiff's affair with Stenson began in 1980 and ended in either late 1988 or early 1989. There was a brief break-up in 1983. The evidence showed that once in 1985 Stenson's wife, Arie, showed up at the plaintiff's house when Stenson was there watching T.V. Arie grabbed the plaintiff by the hair and ripped her blouse. On another occasion in 1985, Arie entered a clothing store where the plaintiff was working part-time. Arie and her friends were being noisy and disruptive, and the store manager called a security guard. No words were spoken between Arie and the plaintiff. The defendants did not produce any evidence that either of these incidents caused the plaintiff to suffer severe emotional distress. The defendants also introduced evidence that on one occasion the plaintiff discussed with Dr. Ores problems that she was having with John Stenson. Dr. Ores testified that this occurred

in 1985. The plaintiff recalled it happening in 1983 or 1984. Regardless, this took place before Dr. Overcash arrived at St. Marks Court and the plaintiff continued to see Stenson.

The closest the defense could come to showing emotional distress occurring as a result of the Stenson affair during the relevant time period was the testimony of Tammy Deemie. Deemie, the daughter of Dr. Ores's girlfriend, testified that on one occasion in either 1986 or 1987 she observed the plaintiff crying because Stenson was seeing another woman. The plaintiff denied that this happened, and no other witnesses testified to such an occurrence. Regardless, this testimony by Deemie did not make evidence of the affair relevant. "Relevancy is established where a fact offered tends to prove a fact in controversy or renders a matter in issue more or less probable. To be probable, it must be tested in the light of logic, experience and accepted assumptions as to human behavior." (*Marut v. Costello* (1966), 34 Ill. 2d 125, 128, 214 N.E.2d 768, 769.) We disagree with the defendants that the evidence showed that the Stenson relationship caused the plaintiff's severe emotional distress. The only evidence the defendants had of problems with the relationship during the relevant time period was the aforementioned testimony of Deemie. If this is relevant, then everything the plaintiff cried once about during those two years would be relevant. The defendants failed to provide the crucial linking evidence that this relationship caused the plaintiff to suffer severe emotional distress. The only expert who testified about the cause of plaintiff's emotional and mental problems was the plaintiff's expert, Dr. Chapman, who testified that the relationship was a supportive one. Absent evidence that there were problems with the Stenson relationship in 1986 and 1987 that caused the plaintiff to suffer severe emotional distress, the trial court erred in admitting such testimony and the plaintiff was unfairly prejudiced. Closely connected to this issue is the plaintiff's argument that evidence that she asked one of Stenson's friends and superiors in the police department to ask him to quit calling her was irrelevant, prejudicial, and improperly admitted. This incident occurred before Dr. Overcash arrived at St. Marks Court, and the plaintiff and Stenson continued to see each other. Because we have determined that the entire Stenson relationship was irrelevant, this evidence was also improperly admitted and was unfairly prejudicial to the plaintiff.

The plaintiff also argues that it was error to allow the defense to introduce evidence of homosexual behavior by one of the plaintiff's witnesses. Dr. Ores testified that the plaintiff was upset,

pouty, and moody as a result of walking in on her friend, Linda Whitlatch, rolling around on her living room floor with three naked women. The plaintiff denied the incident. Although this episode occurred during the relevant time period, it is still irrelevant for the same reason the Stenson relationship was. The defense failed to produce evidence that this incident caused the plaintiff to suffer severe emotional distress or that the plaintiff suffered any lasting, negative effects as a result of the alleged incident. To the contrary, the evidence showed that the plaintiff and Whitlatch remained close friends. Although this evidence was improper, it would not alone require reversal. However, as the cause will be remanded for a new trial, this evidence should not be allowed on retrial.

The plaintiff also argues that evidence of gifts she received from Stenson and from her divorce attorney was irrelevant and prejudicial. We need not discuss evidence of gifts from Stenson as we have already determined that the entire relationship was irrelevant. On cross-examination of the plaintiff, defense counsel elicited testimony regarding a diamond that was given to the plaintiff by her divorce attorney, James Reynolds. Evidence of gifts received by the plaintiff was barred by a previous court order. However, an exception to that ruling was that such evidence could be presented to show interest, bias, or prejudice of a witness, or for impeachment purposes. The record reflects that the plaintiff testified regarding her involvement in getting Dr. Ores' son, attorney Nicholas Ores, to join Reynolds's practice. When Reynolds told the plaintiff he was looking for a new associate, the plaintiff mentioned the name of Nicholas Ores. The plaintiff then called Dr. Ores and told him about the opening. She also talked to Nicholas about it on two occasions. After Nicholas joined the practice, Reynolds thanked the plaintiff for her involvement by giving her a diamond. Defendant Overcash argued to the trial court and to this court that the evidence of the diamond gift impeached the plaintiff. The trial court also found that the evidence went to "interest, bias, or motivation." We are at a loss to understand how this evidence impeached the plaintiff because she never denied her involvement in encouraging Nicholas to join Reynolds. Further, the only way in which the evidence could be relevant for bias would be if Reynolds testified, which he did not. This evidence was irrelevant to the proceedings and should not be admitted at the next trial.

## VI. CONDUCT OF DEFENSE COUNSEL

The plaintiff's next argument is that defense counsel made nu-

merous improper statements and comments and propounded improper questions that severely prejudiced her right to a fair trial. The plaintiff's argument on this issue covers 31 pages of her brief and is a detailed analysis of how certain comments of defense counsel were improper and prejudicial. Most of the behavior that the plaintiff objects to was engaged in by counsel for defendant St. Marks. The defendants' response to the plaintiff's argument on this issue is shocking. Counsel for St. Marks responds in cursory fashion by citing some boilerplate language that is not even relevant to the instant case. He then spends a few pages pointing out what he believes to be improper behavior by plaintiff's counsel. He concludes with the baffling comment that the plaintiff's appellate brief emphasizes only the plaintiff's positions. We are unaware of any rule that requires an attorney to argue both sides on appeal. Apparently that is what counsel for St. Marks wants, as he declined to respond to any of the plaintiff's specific arguments regarding his improper conduct. Counsel for St. Marks offered no arguments in support of any of the comments or statements he made that plaintiff believes were improper. St. Marks' argument that a party seeking a new trial must first move for a directed verdict or mistrial is unworthy of response. The lackadaisical effort put into the appellate brief on behalf of St. Marks is both inexplicable and inexcusable given the extraordinary amounts of time and money that have gone into this litigation.

Counsel for defendant Overcash apparently concedes that all of the behavior the plaintiff complains of was error. In his brief he states that he "offers no excuse for the instances of improper questioning, improper argument and improper comments by counsel for St. Marks Court which appear from time to time throughout the record." He also states that the errors which appear in the record are "the product of bad lawyering." He then goes on at length about certain behavior of plaintiff's counsel that he believes was improper. Plaintiff characterizes this argument as defendant's "football theory of trial which would allow for 'offsetting personal fouls.' " Plaintiff also correctly notes that our supreme court has rejected such an argument: "The offsetting of one impropriety by another may be an efficient method of arbitration, but in the conduct of a trial this court is concerned with the question of whether or not the defeated party received a fair trial." (*Crutchfield v. Meyer* (1953), 414 Ill. 210, 214, 111 N.E.2d 142, 144.) Counsel for defendant Overcash also believes that the trial court should be affirmed because the litigation is heading into its sixth year, it has

cost an incredible amount of time and money and has affected people's lives, and because the plaintiff should be happy with the verdict and be willing to move on with her life because Dr. Overcash is willing to do so. The seriousness of the issues in this case, and the fact that it has cost "an incredible amount of time and money," only deepen this court's disappointment in defense counsel for not deeming the cause important enough to prepare adequate responses to the issues raised by the plaintiff on appeal.

The plaintiff first argues that defense counsel improperly stated facts during opening argument that were never proved. Absent good faith, it is reversible error to comment in an opening statement about evidence that counsel does not intend to prove. (*Charpentier*, 150 Ill. App. 3d 988, 502 N.E.2d 385.) The following assertions made by counsel for St. Marks were not supported by evidence introduced at trial:

(1) Stenson was present in the offices of St. Marks *after* the arrival of Dr. Overcash, telling Dr. Ores about arguments he had with the plaintiff.

(2) The plaintiff was very upset and depressed at *various points in time* between 1986 and 1987 directly as a result of a relationship with John Stenson.

(3) There were two altercations between the plaintiff and Arie Stenson. (There was no evidence that an altercation ensued with the plaintiff when Arie showed up at the store where she was working part-time.)

(4) The plaintiff wore heavy makeup.

(5) The plaintiff initiated most of the acts she complained about.

(6) Linda Whitlatch told the plaintiff about every check that was sent out of the office.

(7) The plaintiff asked Dr. Ores, "Dr. Ores, why are you allowing Dr. Overcash to have this much money? Why is he a 50% partner?"

(8) Each and every time Dr. Overcash was paid any sum of money in the case, Dr. Ores was forced to justify this to the plaintiff because the plaintiff has always been extremely interested in money.

(9) Dr. Ores told the plaintiff and other employees, "Henceforth, when this young doctor starts in the office, he will be the one who runs the office, and I want nothing more to do with having to deal with this."

■■ It would be difficult to conclude that these statements were made in good faith, as defense counsel has not bothered to justify

any of them or explain why any of them were made. Particularly egregious are statements that Dr. Ores was forced to justify every sum of money paid to Dr. Overcash and that the plaintiff was told about every check that left the office. Counsel knew that there was no such evidence and was obviously trying to portray the plaintiff as a gold digger to the jury. All of the above statements were improper and prejudicial and should not be repeated at the next trial.

The plaintiff also argues that defense counsel made improper statements during closing argument that were not supported by the evidence. An attorney is permitted wide latitude in closing argument, and a judgment will not be reversed unless the challenged remarks were of such a character that they prevented the plaintiff from receiving a fair trial. (*Moore v. Centreville Township Hospital* (1993), 246 Ill. App. 3d 579, 616 N.E.2d 1321.) Failure to object to comments made during closing argument is considered a waiver of the objection. (*Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.* (1991), 217 Ill. App. 3d 94, 576 N.E.2d 918.) However, if the comments are so prejudicial that the parties litigant cannot receive a fair trial, the court may consider such assignments of error even in the absence of objection. *Schwedler v. Galvan* (1977), 46 Ill. App. 3d 630, 360 N.E.2d 1324.

We find that the plaintiff has waived any objection to virtually all of the statements in closing arguments that she now claims are improper. One of the comments that plaintiff did object to was the comment by counsel for St. Marks that "neither Linda Sutton nor her son cried in their [*sic*] deposition." This comment was particularly egregious because counsel was improperly offering his own testimony to the jury. (See *Charpentier*, 150 Ill. App. 3d at 998, 502 N.E.2d at 392 ("Plaintiff is entitled to a fair trial, free from prejudicial conduct of counsel, who undertakes to supply facts or makes inferences not based upon evidence in the record").) Although the plaintiff's objection was sustained, the damage had already been done. This comment implied that the plaintiff and her son were putting on a show for the jury.

Several of the comments that passed without objection were improper and, while they will not be considered reversible error, we assume they will not occur again on retrial. The following comments were not fair characterizations of the evidence:

(1) Comments implying that plaintiff filed a fraudulent tax return with respect to the cost basis of a lost diamond ring. Evidence regarding the listing of the diamond ring is irrelevant and should not be admitted, and counsel should not otherwise comment on it.

(2) Comments implying that plaintiff had conspired with others to suborn perjury.

(3) Comments that impugn the integrity of the plaintiff without foundation, such as, "A woman who isn't home like most of the underrated people in this country who are trying to survive."

(4) Comments that impugn the integrity and competency of other counsel and suggestions that other counsel have engaged in unethical conduct.

The plaintiff also argues that defense counsel improperly impeached witnesses throughout the trial and failed to close impeachments. The plaintiff points out that counsel often suggested through innuendo that impeaching evidence existed and then failed to produce it. Once counsel by cross-examination lays a foundation for impeachment, he is under an obligation to produce impeaching evidence. (*Green v. Cook County Hospital* (1987), 156 Ill. App. 3d 826, 510 N.E.2d 3.) The following are two of several examples of this continuing tactic by defense counsel:

(1) Counsel for St. Marks asked Sheryl Shelton, one of the plaintiff's witnesses, if she told another employee that she did not know anything about the case. Shelton replied that she did not. Counsel repeated the question, and Shelton again denied it. The other employee was never called to testify.

(2) Counsel for St. Marks asked the plaintiff, "Did you ever express to Dr. Ores or anyone else in the office that you felt uncomfortable being around Dr. Thompson because of his alleged sexual comments or advances to you?" The plaintiff denied this, and no evidence was produced that plaintiff ever made any complaints about Dr. Thompson regarding sexual comments or advances. This comment was particularly prejudicial to the plaintiff because it implied that she had made similar complaints about previous employers.

The continual pattern of implying that there was impeaching evidence when none was produced was prejudicial to the plaintiff's case, and, together with other errors, requires that the plaintiff be given a new trial. Our review of the record indicates that the failure to close impeachments was a problem with all counsel, and they are admonished not to continue this improper tactic on retrial.

## VII. LOST WAGES INSTRUCTION

■ The plaintiff argues that the court erred in failing to instruct the jury with respect to lost wages. The general rule of damages in a tort action is that the wrongdoer is liable for all injuries resulting directly from the wrongful acts, whether they could or

should not have been foreseen by him, provided the particular damages are the legal and natural consequences of the wrongful act imputed to the defendant, and are such as might reasonably have been anticipated. (*Siemieniec v. Lutheran General Hospital* (1987), 117 Ill. 2d 230, 512 N.E.2d 691.) In order to recover lost earnings, all the law requires is that the plaintiff present evidence which will establish, with a fair degree of probability, a basis for the assessment of damages. (*Casey v. Baseden* (1985), 131 Ill. App. 3d 716, 475 N.E.2d 1375.) The plaintiff argues that she was constructively discharged from her employment by Dr. Overcash's harassing actions and that she took a job that paid her substantially less. Defendant Overcash argues that the plaintiff voluntarily left her employment and that she failed to mitigate damages by looking for other employment that did not pay less. We agree with the plaintiff that she was entitled to a jury instruction on lost wages. The plaintiff presented evidence that Dr. Overcash's behavior forced her to leave and that she initially took a job that paid her less. The plaintiff further presented evidence of the amount her earnings decreased in the year after she left St. Marks. The defendant's argument goes more towards the quality of the plaintiff's evidence rather than lack of foundation. On retrial, the plaintiff is entitled to a jury instruction on lost wages.

### VIII. OTHER ISSUES

The plaintiff has raised several other issues that we see no need to address. The plaintiff argues that, during closing argument, defense counsel made an improper comment regarding the verdict forms. However, plaintiff has waived this argument by failing to object when the comment was made. Plaintiff also argues that judgment should be entered against St. Marks as a matter of law on count II, and that her motion to amend her complaint during trial was improperly denied. Because we are reversing and remanding the cause for a new trial, we need not address these arguments.

### IX. CONCLUSION

We conclude that this was a close case and that the cumulative effect of the various errors that occurred resulted in a trial that was not fair. These errors include the admission of improper and prejudicial evidence, remarks of counsel in opening statement that were not proved, counsel "testifying" to matters occurring outside the courtroom, and the continual failure of counsel to close impeachments. The plaintiff has asked that she be given a new trial

on damages only, or, in the alternative, a new trial on damages and liability on count I, or a new trial on damages and liability on both counts. We conclude that the only fair result would be a new trial on liability and damages on both counts. A remand for a new trial on damages alone is only appropriate when the damages issue is so separable and distinct from the issue of liability that a trial on damages alone may be had without injustice. (*Hartseil v. Calligan* (1976), 40 Ill. App. 3d 1067, 353 N.E.2d 10.) That is not the case here. The cause is reversed and remanded for a new trial.

Reversed and remanded.

BARRY and BRESLIN, JJ., concur.