Yasmin AL–DABBAGH, Plaintiff,

v.

GREENPEACE, INC., et al., Defendants.

No. 94 C 4941.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 19, 1994.

Opinion Supplementing Decision
Dec. 21, 1994.

Allen W. Dub, Chicago, IL, for plaintiff.

Matthew J. Piers, Eric A. Bers, Jennifer L. Fischer, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Yasmin Al–Dabbagh ("Al–Dabbagh") brings this action against her former employer Greenpeace, Inc. ("Greenpeace") and ex-Greenpeace employee Jimmie Mitchell ("Mitchell"), asserting in Count I that Mitchell's brutal rape of Al–Dabbagh at Greenpeace's Chicago offices on December 26, 1992 constituted sex discrimination in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e to 2000e–17) ("Title VII"). Al–Dabbagh also advances six pendent Illinois state law claims, to which the Complaint has attached these Roman numerals and labels:

II. Battery

III. Assault

IV. Intentional Infliction of Emotional Distress

V. Negligent Retention

VI. Negligent Supervision

VII. Negligent Entrustment

Each of Counts I through IV is asserted against both Greenpeace and Mitchell, while Counts V through VII target only Greenpeace.

Greenpeace has moved under Fed.R.Civ.P. ("Rule") 12(b)(6) to dismiss the Complaint against it for failure to state even one viable claim. For the reasons stated in this memorandum opinion and order, the motion is denied as to Count I and granted as to Counts II through VII.

### Facts [1]

Greenpeace is a non-profit California corporation with offices throughout the United States. As of late 1992 the employees at Greenpeace's Chicago office (most of them of college age, with the management employees also being well under the age of 40) enjoyed what may readily be described as a loose work atmosphere (perhaps an understatement). Employees (including management and supervisory people) were free to and did (1) wear blue jeans, (2) drink beer openly during business hours (the beer was kept in a Greenpeace-provided refrigerator) and (3) smoke marijuana as well as drink beer outside on the fire escape—an area known as "party lane."

But Mitchell took Greenpeace's tolerance of the use of alcohol and "recreational" drugs to extremes. He had a history of reporting to work intoxicated, and he added cocaine to the list of substances used (abused?) in the workplace—both of those things being known

---

[1] What follows is an account that credits Al–Dabbagh's well-pleaded allegations with the requisite reasonable inferences in her favor (*Bowman v. City of Franklin*, 980 F.2d 1104, 1107 (7th Cir.1992)). For that purpose this opinion has disregarded two obvious typographical errors as to dates referred to in Complaint ¶¶ 60 and 66.

to Greenpeace's supervisory personnel. Mitchell also had a reputation as a "womanizer" and engaged in inappropriate conduct of a sexual nature toward, and made unwelcome sexual overtures to, female employees. Although Greenpeace knew about Mitchell's drug and alcohol abuse and sexual misconduct, the only action that it took against him was an oral reprimand about December 23, 1992 for Mitchell's having reported to work in an intoxicated state.

On December 21, 1992 20–year–old Al–Dabbagh began work at Greenpeace's Chicago office as a telephone donation solicitor and was trained under the supervision of Bruce Kripner ("Kripner") for three or four days. Kripner was an "employee and managerial agent" of Greenpeace, while Mitchell was an "employee."

On Al–Dabbagh's arrival at work on December 26 (a Saturday), Mitchell introduced himself as her shift supervisor (he was the only supervisory person on duty that day) and monitored her telephone sales "rap." That day Mitchell had keys to the office and was responsible for opening and closing the facilities. Toward the end of the day, as Al–Dabbagh was gathering her personal belongings and preparing to leave, Mitchell suddenly attempted to kiss her. When Al–Dabbagh rejected his actions as unwelcome and said that she was leaving immediately, Mitchell slapped her, tore off her shirt, beat her, hit her on the head with a radio, choked her with a phone cord and ultimately forced her to have sex with him. In the early hours of December 27 Al–Dabbagh escaped and telephoned the police. She was then treated for her injuries at a local hospital. Mitchell was arrested and charged with aggravated criminal sexual assault.[2]

On December 28 Al–Dabbagh informed Greenpeace management personnel of the rape and expressed an interest in returning to work as soon as possible. Her efforts to resume employment were delayed until January 6 or 7, 1993, when she was permitted to do so. But the reunion proved short-lived. On January 9 Al–Dabbagh reported the incident to Greenpeace's executive offices in Washington, D.C. On January 18 a female member of Greenpeace's Board of Directors questioned Al–Dabbagh about whether she intended to file charges of discrimination or a lawsuit concerning the rape. Al–Dabbagh told the Board member that she did not know what she would do and was uncomfortable talking about it then. After that meeting, Greenpeace management became "aloof and unresponsive" to Al–Dabbagh. Indeed, rumors circulated in the workplace that Al–Dabbagh had fabricated the rape story—an effort to discredit and ostracize her. On January 20, citing an atmosphere of distrust and tension and constant encouragement by Greenpeace to seek other employment, Al–Dabbagh quit her job by telephone.

### Operative Legal Principles

At the outset it is worth taking what in some respects is a side excursion into the nature of Al–Dabbagh's Complaint and its impact on the current motion. For Rule 12(b)(6) purposes the standard for a complaint's survival are really undemanding (*Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)):

> A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.

And consistently with that standard and with the notice-pleading regime enacted by the Rules (see, e.g., Rules 8(a)(2) and 8(e)(1)), the original design of Rules 8(e)(2)[3] and 10(b)[4] contemplated a quite different and more limited use of separate counts than what has come to be the widespread (or it might even be termed near-universal) practice today.

---

**2.** To jump ahead in the chronology, on March 30, 1994 Mitchell was convicted of rape and sentenced to six years in the Illinois Department of Corrections. As the next paragraph of the text reflects, that was after Al–Dabbagh and Greenpeace had already parted company.

**3.** "A party may set forth two or more statements of a claim ... alternately or hypothetically, either in one count ... or in separate counts...."

**4.** "Each claim founded upon a separate transaction or occurrence ... shall be stated in a separate count ... whenever a separation facilitates the clear presentation of the matters set forth."

Instead Al–Dabbagh's Complaint typifies what is seen in many such pleadings every day: the splintering of a claim "founded upon a [*single*] transaction or occurrence" into multiple so-called "counts" simply because those counts assert different theories of recovery. Whatever may be said in favor of that near-epidemic practice, it certainly harbors the potential for considerable mischief. Frequently it leads to misguided Rule 12(b)(6) motions (and sometimes even to misguided Rule 12(b)(6) rulings)—something that has required our Court of Appeals to announce in a closely related context (*NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 291–92 (7th Cir.1992) (citations omitted)):

> Plaintiffs' complaint begins with 66 paragraphs and then states five "claims," each of which incorporates these paragraphs and asserts one reason why the conduct is wrongful.... Perhaps the judge was led astray by the structure of the complaint. Identifying legal theories may assist defendants and the court in seeing how the plaintiff hopes to prevail, but this organization does not track the idea of "claim for relief" in the federal rules. Putting each legal theory in a separate count is a throwback to code pleading, perhaps all the way back to the forms of action;[5] in both, legal theory and facts together created a "cause of action." The Rules of Civil Procedure divorced factual from legal aspects of the claim and replaced "cause of action" with "claim for relief" to signify the difference. A complaint should limn the grievance and demand relief. It need not identify the law on which the claim rests, and different legal theories therefore do not multiply the number of claims for relief.

One set of facts producing one injury creates one claim for relief, no matter how many laws the deeds violate.

To be sure, there are sometimes affirmative reasons for a plaintiff's reliance on different theories of liability. One obvious example is the typical coupling of (1) a 42 U.S.C. § 1983 claim for an unlawful Fourth Amendment[6] "seizure" stemming from a policeman's arrest of the plaintiff without probable cause with (2) a state law claim for false arrest based on the identical incident. That distinction makes a substantive difference: In the Section 1983 claim the employer municipality cannot be sued because of the unavailability of the respondeat superior doctrine (*Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)), while in the state law claim the municipality may be joined under supplemental jurisdiction principles (28 U.S.C. § 1367) and may thus be directly subject to a verdict for recovery of the same damages.[7]

But all too often the multiplication of so-called counts amounts only to plowing the same factual field over and over again, and that is frequently counterproductive. Even apart from extending that "plowing" metaphor to liken the process to the exhaustion of soil through attempted overproduction, thus potentially rendering the soil barren, the resulting proliferation of jury instructions to cover each possible theory of recovery regularly creates confusion and the potential for error. Relatedly, devising verdict forms to minimize any potential for duplicative recovery, or sometimes to avoid the potential for less than full recovery, consistently taxes the ingenuity of counsel and courts alike. And there is no question that the resulting complex verdict forms have a strong tendency to confuse jurors, as well as creating complica-

**5.** [Footnote by this Court] As Frederic Maitland said in a once-famous aphorism (*The Forms of Action at Common Law* 2 (1936 ed.)) that has presumably departed from view in the law schools of today:

> The forms of action we have buried, but they still rule us from their graves.

**6.** As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill

of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

**7.** Even in that common situation, however, the presentation of such dual counts to a jury may provide a source of confusion—a possibility that was translated into reality only last week in this Court's own courtroom.

tions for counsel in dealing with the subject of damages in their closing arguments.

All of that having been said, however, this opinion must perforce deal with Al–Dabbagh's Complaint as it has been drafted, just as the parties have done in their briefs. As will be seen from the ensuing discussion, the Complaint itself survives even though all but one of Al–Dabbagh's separate theories of recovery succumb to Greenpeace's motion.

### Title VII

■ Al–Dabbagh claims that Greenpeace violated her right under Title VII (specifically 42 U.S.C. § 2000e–2) not to be discriminated against on the basis of her sex by (1) failing to remedy a work environment that it knew was hostile toward women and then (2) constructively discharging her for no other reason than that she had been raped. That is more than sufficient to state a claim under Title VII, and Greenpeace's motion to dismiss Count I is therefore denied.

■ Title VII's prohibition against sex discrimination includes a ban on sexual harassment (*Harris v. Forklift Sys., Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405–2406, 91 L.Ed.2d 49 (1986)). Sex discrimination of that type occurs either (1) where an employer's conduct creates a work environment that is hostile or abusive to women (the so-called hostile work environment theory) (*Harris,* —— U.S. at ——, 114 S.Ct. at 370; *Meritor,* 477 U.S. at 66, 106 S.Ct. at 2405) or (2) where specific benefits of employment are conditioned on sexual demands (the so-called quid pro quo theory) (*Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404; *Dockter v. Rudolf Wolff Futures, Inc.,* 913 F.2d 456, 458–61 (7th Cir. 1990)).

■ As for the first of those alternative bases, the test for determining whether sexually inappropriate behavior rises (or perhaps more accurately, lowers) to the level of actionable sex discrimination is inherently imprecise and requires that the factfinder examine all the circumstances (including the frequency and severity of the alleged misconduct, whether it was physically threatening

or humiliating and its effect on the victim's psychological well-being) and conclude both (1) that a reasonable person would have found the environment hostile or abusive (the objective prong) and (b) that the victim did in fact perceive it as such (the subjective prong) (*Harris,* —— U.S. at —— – ——, 114 S.Ct. at 370–71; *Dey v. Colt Constr. & Devel. Co.,* 28 F.3d 1446, 1453–57 (7th Cir.1994)). Thus a woman who has proved that a supervisor fondled, grabbed and touched her over a two-week period (*Dockter,* 913 F.2d at 459–60) and another woman who was forced to view explicit pornographic materials depicting interracial acts of sodomy and bestiality (*Brooms v. Regal Tube Co.,* 881 F.2d 412, 416–17 (7th Cir.1989)) and still another woman who was subjected to the "repeated use of sexually-explicit commentary and sexual innuendo" (though no physical touching or quid pro quo suggestion was involved) (*Dey,* 28 F.3d at 1453, 1450) were all held to have established Title VII violations. Two weeks ago *Hutchinson v. Amateur Elec. Supply, Inc.,* 42 F.3d 1037, 1041–44 (7th Cir.) affirmed a jury finding of sexual harassment where a male supervisor left his office door open while discussing sex on the phone (to make sure his salacious comments would be heard by the female office employees), referred to one female employee as "Ms. Boobs," regularly looked plaintiff up and down while making comments about her appearance and regularly blocked the way of female employees through the office so that they had to brush up against him as they passed.

By contrast, a woman who complained that her boss called her a dumb blond, asked her out on dates, put his hand on her shoulder several times, placed "I love you" signs in her work area and attempted to kiss her in a bar (*Weiss v. Coca–Cola Bottling Co. of Chicago,* 990 F.2d 333, 337 (7th Cir.1993)) and another woman who claimed that her manager "lurched" at her during a trip to the arboretum, as if to grab her, and made a pass at a jazz club (*Saxton v. AT & T,* 10 F.3d 526, 533–34 (7th Cir.1993)) have both been held by the same court to have failed to allege objectively hostile work environments. *Weiss,* 990 F.2d at 337 reasoned that the

alleged misconduct was "relatively isolated" and not "serious." Similarly *Saxton*, 10 F.3d at 534 found that the manager's advances (though "undoubtedly inappropriate") were not "severe or pervasive."

■ Understandably in light of the nature of the misconduct involved, simple responde-at superior notions do not apply in the hostile-work-environment context. Instead an employer is liable for the sexual misconduct of an employee only if the employer knew or should have known about the harassment and failed to take adequate remedial action (*Saxton*, 10 F.3d at 535–36; *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir.1990); *Brooms*, 881 F.2d at 421)). As *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir.1994) (citations omitted) has explained:

> So there really are only two questions in a case such as this. The first is whether the plaintiff was, because of her sex, subjected to such hostile, intimidating, or degrading behavior, verbal or nonverbal, as to affect adversely the conditions under which she worked; for Title VII is not directed against unpleasantness per se but only, so far as it relates to this case, against discrimination in the conditions of employment. The second question is whether, if so, the defendant's response or lack thereof to its employees' behavior was negligent. It would be unrealistic to expect management to be aware of every impropriety committed by every low-level employee. But if it knows or should have known that one of its female employees is being harassed, yet it responds ineffectually, it is culpable. The two questions, harassment of the employee and negligence of the employer, are linked as a practical matter because the greater the harassment—the more protracted or egregious, as distinguished from isolated or ambiguous, it is—the likelier is the em-

ployer to know about it or to be blameworthy for failing to discover it.

Al–Dabbagh alleges that Greenpeace had turned a blind eye to Mitchell's sexual abuse of female employees in its Chicago office before she fell victim to it and consequently suffered grave bodily and psychological injury. As already stated, Greenpeace's single response to Mitchell's earlier conduct—an oral reprimand for his drinking—fell far short of addressing the more serious problems posed by his conduct. There is no question that those allegations, credited as they must be on the present motion, amply support the first (objective) element of a hostile-environment claim—the evaluation of Mitchell's conduct by a reasonable person.

■ As for the second (subjective) factor, Greenpeace advances the frankly outrageous argument that because newly-hired Al–Dabbagh was unaware of Mitchell's depredations before she fell prey to his sexual advances and rape, she lacked the required perception of the work environment as hostile. If accepted, that proposition would insulate Greenpeace against liability for a known miscreant's first attack on each recently hired nubile young woman.[8] This Court rejects that offensive notion, holding instead that Al–Dabbagh's reaction to the actual experience—her natural reaction to being personally exposed to the offending employee's violent sexual misconduct—establishes the requisite subjective prong even though she had not previously known of Mitchell's proclivities.

Al–Dabbagh also complains of Greenpeace's conduct after the rape, claiming that the way in which she was treated between December 28, 1992 and January 20, 1993 constituted further discrimination against her. In essence she alleges that Greenpeace forced her to quit for no other reason than that she had herself been a victim of the

---

**8.** In Illinois the old common law rule (superseded by statute, 510 ILCS 5/16) established a "one free bite" principle, requiring that the dog owner have knowledge of the dog's vicious nature before the owner might be held liable for its attack on someone who then brings suit (see, e.g., *Steinberg v. Petta*, 114 Ill.2d 496, 500, 103 Ill.Dec. 725, 727, 501 N.E.2d 1263, 1265 (1986) and cases cited there). But even that outdated rule did not allow one free bite *per person* (which is the essential equivalent of Greenpeace's present contention). Once the owner was put on notice of the dog's propensities, liability ensued in favor of *anyone* who then suffered an initial (or any succeeding) injury.

hostile environment—that she had been raped.

Al–Dabbagh couches those allegations in terms of "constructive discharge," but that is really unnecessary to the statement of a viable claim. After all, the precondition for Title VII liability is a sex-based adverse employment action by the employer—and where as here the employee's injury flows directly from a specific manifestation of a hostile work environment previously known to the employer (or constructively known—the "should have known" alternative), it is the employer's failure to have taken earlier remedial action that itself constitutes the "adverse employment action." Thus *Townsend v. Indiana Univ.*, 995 F.2d 691, 693 (7th Cir.1993) has made clear that "involuntary termination, whether in the form of outright discharge or of constructive discharge (where the employer makes life so unbearable for the employee that the latter quits)" is *not* "a sine qua non to prevailing under Title VII" and that "[t]he only question is whether the discrimination inflicted the kind of harm for which Title VII offers redress."

Here Al–Dabbagh (much like the *Townsend* plaintiff) alleges that she suffered severe emotional and physical distress as the result of Greenpeace's treatment during the three weeks following the rape (Greenpeace encouraged her to seek other employment, questioned her intentions regarding a possible lawsuit and otherwise made her life at work unbearable)—all as a result of the lone fact that she had recently been the victim of a brutal sex crime. Those things are not things that Al–Dabbagh must prove to state a claim. Instead they simply provide her with the potential for additional recovery—compensatory or punitive damages or both, and perhaps reinstatement or back pay—for a Title VII violation that was already complete when she suffered the rape itself.

### State Law Claims

Greenpeace has moved to dismiss all six Illinois-law-based counts (Counts II through VII) in Al–Dabbagh's Complaint on two independent grounds. One of those grounds is that all six theories of recovery are barred by the exclusivity provisions of the Illinois

Workers' Compensation Act ("Act"), particularly 820 ILCS 305/5:

> No common law or statutory right to recover damages from the employer ... for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act....

and *id.* 305/11:

> The compensation herein provided, together with the provisions of this Act, shall be the measure of the responsibility of any employer....

Because that argument proves fully dispositive of all of Al–Dabbagh's state law claims against Greenpeace, it will be addressed first, before briefly discussing Greenpeace's other contention.

■ Illinois courts have consistently read the quoted provisions of the Act as barring suits against employers for injuries intentionally inflicted by one employee upon another (*Meerbrey v. Marshall Field & Co.*, 139 Ill.2d 455, 463, 151 Ill.Dec. 560, 564, 564 N.E.2d 1222, 1226 (1990); *Richardson v. County of Cook*, 250 Ill.App.3d 544, 545–49, 190 Ill.Dec. 245, 247–49, 621 N.E.2d 114, 116–18 (1st Dist.1993)). Two recognized exceptions to that principle exist: (1) where an employer expressly authorizes the injurious conduct and (2) where an assailant is considered to be the employer's alter ego (*Meerbrey*, 139 Ill.2d at 464, 151 Ill.Dec. at 564, 564 N.E.2d at 1226). Al–Dabbagh attempts to bring her case within each of those exceptions, arguing first that in turning a blind eye towards Mitchell's earlier abusive behavior Greenpeace somehow "authorized" her rape and second that Mitchell was Greenpeace's alter ego.

■ To state a claim against an employer for authorizing the injurious conduct of a coworker, an employee must assert that the employer possessed a specific intent to inflict injury on the employee (*Mayfield v. ACME Barrel Co.*, 258 Ill.App.3d 32, 35, 196 Ill.Dec. 145, 149, 629 N.E.2d 690, 694 (1st Dist.1994); *Bercaw v. Domino's Pizza, Inc.*, 258 Ill. App.3d 211, 217, 196 Ill.Dec. 469, 474, 630

N.E.2d 166, 171 (2d Dist.1994); *Copass v. Illinois Power Co.*, 211 Ill.App.3d 205, 212, 155 Ill.Dec. 600, 604, 569 N.E.2d 1211, 1215 (4th Dist.1991)). Three cases involving employee exposure to hazardous substances amply illustrate the restrictiveness of that standard (*Glowacki v. Moldtronics, Inc.*, 264 Ill. App.3d 19, 22–23, 201 Ill.Dec. 706, 708–09, 636 N.E.2d 1138, 1140–41 (2d Dist.1994); *Ryherd v. Growmark, Inc.*, 156 Ill.App.3d 667, 670–71, 108 Ill.Dec. 687, 689–90, 509 N.E.2d 113, 115–16 (4th Dist.1987); *Handley v. Unarco Indus., Inc.*, 124 Ill.App.3d 56, 67–69, 79 Ill.Dec. 457, 466–67, 463 N.E.2d 1011, 1020–21 (4th Dist.1984)).

■ Al–Dabbagh does not even suggest that Greenpeace possessed a specific intent to injure her, nor can such intent be reasonably inferred. Even cast in its most favorable light, it would be quite a stretch to read Al–Dabbagh's Complaint as implying that what Greenpeace knew (or should have known) about Mitchell was enough to put it on notice that his prior sexual overtures might perhaps escalate to the type of sexual violence that he then visited on Al–Dabbagh. But if the Complaint *were* given such a strained reading, that still would not get Al–Dabbagh around the exclusivity bar of the Act, because Illinois courts have rejected even a "substantial certainty" test (materially more than Al–Dabbagh has implied) in favor of the more demanding specific intent standard (*Bercaw*, 258 Ill.App.3d at 214, 196 Ill. Dec. at 472, 630 N.E.2d at 169; *Copass*, 211 Ill.App.3d at 213, 155 Ill.Dec. at 604, 569 N.E.2d at 1215). As a result, Al–Dabbagh's state law claims cannot prevail on any theory of "authorization."

■ As for the other possible exception to the exclusivity of the Act, the alter ego doctrine originated in the quite different corporate law context, where a person injured by a corporation is permitted to recover against a shareholder, officer or director when the corporation was a mere instrumentality of the dominant personality and when strict adherence to the corporate form would promote fraud or injustice (*In re Rehabilitation of. Centaur Ins. Co.*, 158 Ill.2d 166, 173, 198 Ill.Dec. 404, 407, 632 N.E.2d 1015, 1018 (1994); *Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 205, 56 Ill.Dec. 14, 21, 427 N.E.2d 94, 101 (1981)). To pierce the corporate veil on that basis, it must generally be shown that (1) "there is such unity of interest and ownership that the separateness of the individual and corporation has ceased to exist" and (2) "adherence to the fiction of separate existence of the corporation would sanction a fraud or promote injustice" (*People ex rel. Scott v. Pintozzi*, 50 Ill.2d 115, 128–29, 277 N.E.2d 844, 851 (1971)).

■ That original use of the doctrine results in the shifting of liability from corporations to individuals, wiping out the insulation from personal liability that is normally provided by meticulous adherence to corporate form and substance. But where those lines of demarcation between individual and corporation have been thus blurred, courts have also applied similar alter ego notions in the other direction: to thrust individual liability onto corporations. And among other applications of that latter doctrine, such extension of liability has taken place in the area of workers' compensation (*Meerbrey*, 139 Ill.2d at 464, 151 Ill.Dec. at 564, 564 N.E.2d at 1226; *Jablonski v. Multack*, 63 Ill.App.3d 908, 20 Ill.Dec. 715, 380 N.E.2d 924 (1st Dist.1978)), so that the exclusivity provisions of the Act will not bar suit against an employer where an employee is injured by the deliberate misconduct of a co-worker who is considered the employer's alter ego.

*Jablonski*, apparently the first Illinois case to consider that possibility, held that the manager of a restaurant who had assaulted an employee was *not* the alter ego of the restaurant's owner, at least where the restaurateur owned several establishments (63 Ill.App.3d at 911, 913–14, 20 Ill.Dec. at 717–19, 380 N.E.2d at 926–28). In doing so *Jablonski* quoted at length from 2A Larson, *Law of Workmen's Compensation* §§ 68.21 to 68.22 (1976). In light of the Illinois courts' continued reliance on that treatise (*e.g., Meerbrey*, 139 Ill.2d at 464, 151 Ill.Dec. at 564, 564 N.E.2d at 1226; *Fitzgerald v. Pratt*, 223 Ill.App.3d 785, 789, 166 Ill.Dec. 200, 203, 585 N.E.2d 1222, 1225 (5th Dist.1992)), portions of those *Jablonski*-quoted passages warrant reproduction here (63 Ill.App.3d at 912–12, 20 Ill.Dec. at 718, 380 N.E.2d at 927):

When the person who intentionally injures the employee is not the employer in person nor a person who is realistically the alter ego of the corporation, but merely a foreman, supervisor or manager, both the legal and the moral reasons for permitting a common-law suit against the employer collapse, and a substantial majority of modern cases bar a damage suit against the employer.

\*     \*     \*     \*     \*     \*

The correct distinction to be drawn in this class of cases is between a supervisory employee and a person who can genuinely be characterized as the alter ego of the corporation. Take for example, a case like *Heskett v. Fischer [Fisher] Laundry & Cleaners Company, Incorporated* [217 Ark. 350, 230 S.W.2d 28 (1950) ], which is sometimes lumped together with assault cases involving foremen. It seems probable from the facts given in the opinion that the assailant there was so dominant in the corporation that he could be deemed the alter ego of the corporation under the ordinary standards governing disregard of the corporate entity. He was an officer and general manager of the corporation. His name was Fischer, and the corporation's name was Fischer Laundry and Dry Cleaners Company—indicating that it was probably in whole or in part his own business. In such circumstances the attribution of moral responsibility for the actor's conduct to the corporation is quite a different matter from the same process when the actor is merely a foreman or supervisor.

In the specific sexual harassment context, employees have successfully sued their corporate employers on an alter ego theory where a gynecologist-assailant was a 50% shareholder, vice-president, secretary and one of two professional employees of the medical corporation (*Sutton v. Overcash*, 251 Ill.App.3d 737, 755, 191 Ill.Dec. 230, 242, 623 N.E.2d 820, 832 (3d Dist.1993)) and where lawyer-assailant Paul Pratt was the sole

shareholder of Paul Pratt, P.C. (*Fitzgerald*, 223 Ill.App.3d at 789, 166 Ill.Dec. at 204, 585 N.E.2d at 1226). And in the whistle-blower context, an employee's claim for intentional infliction of emotional distress against an employer bank was held not barred by the Act where "persons acting in their capacity as managers" threatened dismissal, assigned extra hours of onerous work, issued unfavorable reviews and subverted an employee's authority over subordinates in retaliation for the employee's having disclosed the use of improper banking procedures to auditors and federal authorities (*Johnson v. Federal Reserve Bank of Chicago*, 199 Ill.App.3d 427, 432, 434, 145 Ill.Dec. 558, 561–62, 557 N.E.2d 328, 331–32 (1st Dist.1990)).

■ By contrast, Al–Dabbagh's state law claims cannot survive on an alter ego theory under any of those authorities. Mitchell was not a Greenpeace officer or director, nor did he possess an ownership interest in the corporation. He did not even have a supervisory or management role at either the national or the local level.[9] Mitchell was simply an employee with a set of keys. Nor of course is the fact that he was put in charge of locking up Greenpeace's Chicago office and supervising operations on one Saturday enough under Illinois law to transform Mitchell into the alter ego of a California corporation headquartered in Washington D.C. with offices throughout the United States.

What has been said to this point unquestionably dispatches all of Al–Dabbagh's state law counts. But it should be added before closing the subject that the same result follows from Greenpeace's alternative reliance on the preemptive effect of the Illinois Human Rights Act, 775 ILCS 5/1–101 to 5/10–103. Just 4½ months ago *Geise v. Phoenix Co. of Chicago*, 159 Ill.2d 507, 515–19, 203 Ill.Dec. 454, 457–59, 639 N.E.2d 1273, 1276–78 (1994) held that allegations that are "inextricably linked" to the concept of sexual harassment must be construed as charging civil rights violations within the scope of that

---

9. This opinion should not be misunderstood as suggesting that the type of low level status in the corporate hierarchy just referred to in the text would suffice to trigger alter ego responsibility for the corporation. Instead the rejection of alter ego notions here really flows a fortiori from the factual situations in the cases that deny such treatment.

statute (775 ILCS 5/2–102(D) and 5/2–101(E)(3)), so that Illinois courts are deprived of jurisdiction over private-party damage actions emanating from such conduct (*id.* 5/8–111(C); *Geise,* 159 Ill.2d at 515–16, 518, 203 Ill.Dec. at 457–58, 639 N.E.2d at 1276–77). That description of "inextricably linked" claims plainly covers Al–Dabbagh's efforts to fit her allegations into common law categories here, though her counsel argues otherwise. And of course federal courts cannot exercise supplemental jurisdiction in those circumstances (see, e.g., *Schwitzenberg v. Lifeline, Ltd. of Illinois,* 1994 WL 684984, at *3–6, 1994 U.S.Dist. LEXIS 17298, at *7–*16 (N.D.Ill. Nov. 30)). Thus Greenpeace's second argument provides another basis for granting its motion as to Counts II through VII.

### Mitchell's Status

Greenpeace's motion has been advanced solely on behalf of the corporation (understandably its counsel have not filed their appearance on behalf of convicted felon Mitchell as well). This Court's resort to the case docket discloses no return of service of process on Mitchell, and the 120–day time clock specified for that purpose in Rule 4(m) has run out a week ago. In those circumstances the remaining question for discussion is what should be done as to Mitchell, where he remains as a potential codefendant in the only count surviving against Greenpeace (Count I) and as the only potential defendant in Counts II through IV.

Because Count I presents a federal question, Mitchell might qualify as a pendent party under the supplemental jurisdiction provision of 28 U.S.C. § 1367(a) even if he were not considered to be an "employer" and were hence not viewed as a proper defendant to Count I's Title VII claim (a much-mooted issue in the current case law). But there seems to be singularly little purpose in retaining Mitchell in the case at all:

1. As already indicated, there is considerable doubt that he is a legitimate target of the Count I claim.

2. As egregious and outrageous as Mitchell's conduct was, there is a question whether it fits the Illinois mold for intentional infliction of emotional distress claims (as asserted in Count IV) because it obviously lacked any element of *continued* harassment.

3. In any event, there seems to be little point in preserving the Count II and Count III tort claims (or Count IV, for that matter) against Mitchell alone—presumably a judgment against him would produce nothing more than tapping an empty barrel.

4. Just as importantly, Al–Dabbagh herself has evidenced no enthusiasm for going after Mitchell individually.

In sum, it seems highly appropriate to invoke Rule 4(m). Unless on or before December 29, 1994 Al–Dabbagh files in this Court's chambers a proof of service on Mitchell together with a statement of reasons for retaining him as a defendant, this action will be dismissed as to Mitchell without prejudice.

### Conclusion

Al–Dabbagh has stated a federal claim against Greenpeace for sex discrimination in violation of Title VII, and Greenpeace's motion to dismiss Count I is therefore denied. Because Al–Dabbagh's state law claims against Greenpeace are barred by both the Illinois Workers' Compensation Act and by the Illinois Human Rights Act, Greenpeace's motion to dismiss is granted (1) as to Greenpeace with respect to Counts II through IV and (2) as to Counts V through VII in their entirety. As for Al–Dabbagh's claims against Mitchell, this Court will await Al–Dabbagh's filing (or lack of filing) referred to in the preceding section of this opinion.

## SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

Just two days ago (on December 19, 1994) this Court issued its memorandum opinion and order (the "Opinion"), sustaining the Title VII sexual harassment claim of Yasmin Al–Dabbagh ("Al–Dabbagh") (based on a hostile-work-environment theory) against the motion to dismiss filed by her ex-employer Greenpeace, Inc. ("Greenpeace"). On the very next afternoon this Court received a package of slip opinions decided by our Court

of Appeals during the preceding week—and included in that current batch was *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439 (7th Cir.1994), which dealt with precisely the same theory of liability under Title VII.

Although the facts and hence the result in *Doe* were sharply different from those that have been presented by Al–Dabbagh's Complaint and that were therefore dealt with in the Opinion, the section of the *Doe* opinion captioned *Standards Governing Sexual Harassment Claims* (*id.* at 443–44) has framed the operative legal principles in a manner completely parallel to what was said in the Opinion at 1110–11. And this Court's ruling that Al–Dabbagh's allegations properly support both the objective and subjective elements of a hostile-work-environment claim is entirely consistent with the exposition in *Doe.*

To be sure, *Doe* discussed the much more frequently encountered situation of a female employee "who has the dedication and fortitude to complete her assigned tasks even in the face of offensive and abusive sexual banter" (*Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1454 (7th Cir.1994), quoted in *Doe,* 42 F.3d at 444). But *Doe*'s statement of the *purpose* that is served by including the subjective element of the claim (to establish "not what a reasonable person might be capable of enduring but whether the offensive acts alter the conditions of employment" (*id.*)) is surely satisfied by both the prior conduct of Greenpeace employee Jimmie Mitchell ("Mitchell")—conduct that was known to, or should have been known by, Greenpeace— and by Al–Dabbagh's first exposure to Mitchell's misconduct in the form of a brutal rape. This supplement is therefore issued for purely reportorial purposes: to identify the most recent word on the subject from our Court of Appeals.